## PEOPLE *v.* BROCATO

1. CRIMINAL LAW—PRELIMINARY EXAMINATION—PROBABLE CAUSE—
   ABUSE OF DISCRETION.

   A magistrate's determination of probable cause at preliminary
   examination on a felony charge will not be disturbed unless
   there is an abuse of discretion.

2. CRIMINAL LAW—ELEMENTS OF CRIME—SCIENTER—INFORMATION—
   SUFFICIENCY—WILLFUL.

   The use of the word "willful" in an information charging a
   felony is sufficient to charge *scienter,* if *scienter* is an element
   of the crime.

3. CRIMINAL LAW—PRETRIAL DISCOVERY—DISCRETION—JUSTICE.

   Discovery must be ordered in all criminal cases, when, in the
   discretion of the trial judge, the thing to be inspected is
   admissible in evidence and a failure of justice may result
   from its suppression.

REFERENCES FOR POINTS IN HEADNOTES

[1] 21 Am Jur 2d, Criminal Law §§ 440, 442, 449.
[2] 41 Am Jur 2d, Indictments and Informations §§ 113, 114.
[3] 23 Am Jur 2d, Depositions and Discovery § 308.
[4] 23 Am Jur 2d, Depositions and Discovery § 317.
[5] 23 Am Jur 2d, Depositions and Discovery §§ 317, 318, 320.
[6] 41 Am Jur 2d, Indictments and Informations §§ 115, 118–120.
[7] 41 Am Jur 2d, Indictments and Informations § 120.
[8] 44 Am Jur, Rape § 107.
[9] 42 Am Jur, Prosecuting Attorneys §§ 19, 20.
[10, 11, 14] 42 Am Jur, Prosecuting Attorneys § 20.
[12, 13] 42 Am Jur, Prosecuting Attorneys § 20.
   53 Am Jur, Trial § 967.
[15] 58 Am Jur, Witnesses §§ 680, 723.
   21 Am Jur 2d, Criminal Law §§ 333–335, 337.
[16] 58 Am Jur, Witnesses § 696.
[17] 21 Am Jur 2d, Criminal Law §§ 333–335.
   58 Am Jur, Witnesses §§ 649, 685–689.
[18] 5 Am Jur 2d, Appeal and Error § 545.
[19] 58 Am Jur, Witnesses §§ 685–689.
[20] 42 Am Jur, Prosecuting Attorneys § 20.
[21, 23] 42 Am Jur, Prosecuting Attorneys §§ 19, 20.
[22–24] 53 Am Jur, Trials § 34.
[25] 53 Am Jur, Trials §§ 132, 154, 965.

4. Criminal Law—Pretrial Discovery—Indecent Liberties—Complainant's Statements.

> Complainant's sexual adventures with men other than defendant are relevant in a prosecution for indecent liberties; hence it was error to limit discovery to those portions of complainant's statements to the prosecution and police which pertained to defendant solely on the ground of relevancy (MCLA § 750-.336).

5. Criminal Law—Pretrial Discovery—Indecent Liberties—Juvenile and Psychiatric Records.

> The complainant's juvenile and psychiatric records are proper subjects of discovery to the defense in a prosecution for indecent liberties.

6. Criminal Law—Date of Offense—Latitude.

> The prosecution has some latitude in fixing the date of an offense, but having selected a date, it must adhere to that date throughout the proceedings.

7. Criminal Law—Indecent Liberties—Time of Offense—Instructions to Jury.

> Instruction to the jury that time was not of the essence in a prosecution for indecent liberties and that it would make no difference if they found that the offense occurred on a date other than that charged, where all evidence tended to establish that the offense occurred on a certain date, there was no evidence to support another date and the latitude allowed was prejudicial to defendant who had a defense in the nature of alibi for that date, *held,* erroneous: the jury should have been confined to the date supported by the evidence in clear instructions.

8. Criminal Law—Rape—Indecent Liberties—Evidence—Testimony of Victim—Corroboration.

> The victim's testimony need not be corroborated to sustain a conviction for rape or indecent liberties (MCLA § 750.336).

9. Criminal Law—Prosecutor—Duty.

> The prosecutor must see that the defendant has a fair trial, and protect the people, who are as concerned with protecting the innocent as convicting the guilty; therefore he must be especially cautious when the offense charged is highly inflammatory.

10. Criminal Law—Prosecutor—Misconduct—Inadmissible Evidence—Polygraph Test—Reference.

Results of polygraph tests or reference to them is inadmissible in Michigan and repeated references to them by prosecutor in questioning witnesses, after warning by court to avoid them were improper and contemptuous.

11. Criminal Law—Prosecutor—Misconduct—Duty of Court.

Openly improper conduct by the prosecutor is usually handled by the trial court either by his contempt power or by his power to grant a new trial in the interest of justice.

12. Criminal Law—Prosecutor Misconduct—Objection—Mistrial —Review.

Defense counsel should have moved for and been granted a new trial when the prosecutor asked improper questions in disregard of court's ruling; but counsel's failure to object does not prevent the appellate court from reversing the conviction.

13. Criminal Law—Prosecutor—Inadmissible Evidence—Guilty Pleas of Others—Reference.

Prosecutor's repeated reference to guilty pleas of others charged with sexual offenses by complainant in prosecution for indecent liberties, after the court's adverse ruling on the first reference, was sufficient for a mistrial (MCLA § 750.336).

14. Criminal Law—Prosecutor—Misconduct—Testimonial Questioning.

Prosecutor's statement that defendant, who had stripped to the waist in court, had less hair on his body than he had when the prosecutor saw him at a social event, *held*, not in interrogation but testimony and highly improper in a prosecution where complainant had testified that man who took indecent liberties with her was hairy on his back and arms (MCLA § 750.336).

15. Criminal Law—Indecent Liberties—Witnesses—Improper Impeachment.

Impeachment of *res gestae* witness in prosecution for indecent liberties who had pled not guilty to similar charges, by testimony by another as to a conversation during which *res gestae* witness described sexual relations he and defendant had had with prosecutrix, *held*, improper, where prosecution knew witness would deny such a conversation and did not question him about it, thereby denying the defendant's Sixth Amendment right of confrontation (US Const, Ams 6, 14; MCLA § 750.336).

16. Witnesses—Interrogation—Religion.

Witnesses may not be questioned about their religious opinions, either before or after being sworn (CLS 1961, § 600.1436).

17. Criminal Law—Indecent Liberties—Irrelevant Interrogation.

Interrogation of defendant charged with indecent liberties about allegations that he was a communist made by his wife in a divorce action 15 years before, *held*, highly improper with the effect of getting hearsay testimony before the jury (MCLA § 750.336).

18. Appeal and Error—Improper Questions—Failure to Object—Preserving Question for Review.

Failure to object to improper questioning at trial forecloses raising the point on appeal.

19. Criminal Law—Defendant Testifying—Impeachment—Previous Arrests.

A defendant, testifying at his own trial, may not be asked if he has been arrested or charged with crime, where the arrest or charge has not resulted in conviction and where the only purpose of the question is to impeach the defendant's credibility as a witness.

20. Criminal Law—Defendant Testifying—Attorney-Client Privilege—Waiver.

Prosecutor's request, in the presence of the jury, that defendant waive his attorney-client privilege *held*, to cause reversible error, because improper inference may be drawn by the jury from the exercise of the privilege.

21. Criminal Law—Prosecutor—Duty.

The prosecutor's duty is as much to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

22. Trial—Court—Duty.

Trial courts are not mere figureheads; they have a statutory duty to control the proceedings during trial and to limit evidence and arguments of counsel to relevant and material matters with a view to the expeditious and effective ascertainment of truth in the matters involved (CL 1948, § 768.29).

23. Criminal Law—Trial Court—Prosecutor—Fair Trial.

Trial court and prosecutor must exercise great care to insure that no statement be made in the presence of the jury that would jeopardize defendant's right to a fair trial.

24. TRIAL—COURT—RULINGS—CONTEMPT—REPRIMAND.
   The rulings of the court are to be followed and when they
   are not, the court should exercise its power of contempt or
   at least reprimand the offender in the jury's presence.

25. TRIAL—OBJECTIONS TO ERROR—DEFENSE COUNSEL.
   Defense counsel cannot ignore error in the hope that it will be
   remedied on appeal; counsel should object to errors made
   during trial, requesting a mistrial when the mere asking of
   questions is prejudicial and, if that fails at least ask that
   the prosecutor be reprimanded and the jury instructed.

Appeal from Kalamazoo, Karl F. Zick, J., presiding. Submitted Division 3 December 5, 1968, at Grand Rapids. (Docket No. 3,590.) Decided May 5, 1969. Rehearing denied June 19, 1969.

Justin Brocato was convicted of taking indecent liberties with a female under the age of sixteen. Defendant appeals. Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Donald A. Burge,* Prosecuting Attorney, and *H. Michael Dwan,* Assistant Prosecuting Attorney, for the people.

*Charles C. Wickett* and *Victor E. Bucknell* (*Ralph E. Helper,* of counsel), for defendant.

*Amicus Curiae:* American Civil Liberties Union of Michigan by *Norton J. Cohen* and *Erwin Ellman,* General Counsel.

BEFORE: R. B. BURNS, P. J., and J. H. GILLIS and CORKIN,* JJ.

J. H. GILLIS, J. This is an appeal from a conviction of taking indecent liberties with a female under

---

* Circuit Judge, sitting on the Court of Appeals by assignment.

the age of 16.[1]  Seventeen persons, including defendant, were separately charged with crimes upon the complaint of a 14-year-old girl, alleging either statutory rape or other sexual offenses.  These cases were of great public interest in Kalamazoo, not only because of the nature of the charges, but because some of the defendants were business and professional men.

The complainant testified that on the evening of September 28, 1965, an attorney, Larry Eldridge, took her to a basement apartment below defendant's law office in Kalamazoo.  She stated that in defendant's presence she and Eldridge had sexual intercourse.  Eldridge then left the room and defendant took off his clothes and laid down next to the complainant.  She charged that he touched her breasts and vagina.  Immediately thereafter, without any attempt by defendant at sexual intercourse, they dressed.  Eldridge then returned and took the complainant home.  Both defendant and Eldridge vehemently denied that the event ever occurred.

A number of questions are raised in this appeal relating to establishing probable cause at the examination, validity of the information, reception of evidence, misconduct of the prosecutor, suppression of evidence, instructions to the jury and sufficiency of evidence.  We will consider them under separate headings.

## I. Probable Cause was Established at the Examination

Although the evidence at the preliminary examination was extremely thin and another magistrate might well have discharged defendant based upon the same evidence, we hold that there was legally sufficient evidence to justify the magistrate in hold-

---

[1] MCLA § 750.336 (Stat Ann 1954 Rev § 28.568).

ing defendant for trial. Since his finding of probable cause was not an abuse of discretion, we do not disturb it. *People* v. *Medley* (1954), 339 Mich 486.

## II. *The Criminal Information Charged an Offense*

Appellant argues that knowledge on the part of defendant that the complainant was under the age of 16 is an element of the crime and was neither pleaded nor proven, nor was the jury properly instructed.[2]

Whether such *scienter* is an element of the crime is immaterial on the record before us and we will not rule on it. If required, it was sufficiently alleged in the information by the charge that defendant acted "willfully". *United States* v. *Amorosa* (CA 3, 1948), 167 F2d 596. *People* v. *Bailey* (1954), 341 Mich 592, cited by defendant, also militates against his argument. *Bailey* held that the statute made knowledge of age and an element of the crime because it used the words "knowingly and willfully". If "willful" used in a statute creates *scienter* as an element, then logic demands that "willful" used in an information charges *scienter*.

## III. *Refusal to Grant Pretrial Discovery to Defendant*

Before trial defendant sought discovery of a written statement which the complainant had made to the police, a stenographically reported statement she had made to the prosecutor, certain juvenile court records relating to the complainant and psychiatric

---

[2] Defendant argues by analogy from *People* v. *Bailey* (1954), 341 Mich 592, which involved a charge of debauching the morals of a boy under the age of 15. That statute (MCLA § 750.339 [Stat Ann 1954 Rev § 28.571]) punishes only those acts done "knowingly and willfully". Neither *Bailey* nor the statutory rape cases cited in opposition by the people are in point because of the substantial difference in the language of the statutes.

reports on the complainant. The motion was granted as to the written statements and "that portion of the stenographic statement that relates to respondent." The balance of the requested discovery was denied. This limitation on discovery is challenged by defendant.[3]

Pretrial discovery, as well as discovery at trial, has received increasing attention from the courts recently. Often intertwined with the issue of discovery is that of suppression of evidence by the prosecution. See *Giles* v. *Maryland* (1967), 386 US 66 (87 S Ct 793, 17 L Ed 2d 737). The problem is vexing and clear constitutional guidelines have not yet been drawn by the United States Supreme Court.[4] We decline defendant's invitation to prophesy the future course of the Supreme Court in this area. The record is inadequate for us to break new ground here. None of the material to which defendant was denied access was made a part of the record before us. Furthermore, his argument on constitutional grounds is so vague that it all but dissipates on close examination.[5]

We do conclude, however, that the limitations placed on the pretrial discovery granted defendant were contrary to Michigan law. The complete stenographic statement should have been turned over to defendant, including that portion which related to

---

[3] Defendant also was denied an opportunity to have a psychiatric examination of the complainant. He does not complain of this on appeal and we express no opinion on the subject.

[4] In *Giles*, for example, four separate opinions were written, none of which commanded the support of a majority of the Court.

[5] As part of what we assume is a due process argument, we are cited to *Jencks* v. *United States* (1957), 353 US 657 (77 S Ct 1007, 1 L Ed 2d 1103), a case involving discovery which was disposed of not on any constitutional basis, but under the supervisory power of the Supreme Court to regulate the course of federal criminal prosecutions. Whatever persuasiveness *Jencks* might have is distinctly eroded by the passage of 18 USC § 3500 which severely limited *Jencks'* holding as to pretrial criminal discovery.

the complainant's sexual adventures with other individuals.

Lest this opinion be read as giving a defendant the right, in all cases, to pretrial disclosure of a complainant's statements to the prosecuting officials, we point out that the trial judge *in his discretion* turned over to the defense, in advance of trial, the written statement of the complainant and the edited copy of the stenographic statement. In doing so he acted well within his discretion. In other circumstances, and perhaps in this case (we do not decide), it would have been within his discretion to refuse the statement to the defense until the witness had completed her direct testimony at trial.[6] However, the excised portion of the stenographic statement was refused the defendant solely on the grounds of relevancy. In this respect we hold that the trial judge was in error.

*People* v. *Johnson* (1959), 356 Mich 619, and *People* v. *Maranian* (1960), 359 Mich 361, deal with pretrial criminal discovery. The rule was stated in *Maranian, supra,* p 368, to be:

"Discovery will be ordered in all criminal cases, when, in the sound discretion of the trial judge, the thing to be inspected is admissible in evidence and a failure of justice may result from its suppression."

Applying this test, the statement of the complainant's sexual adventures with other men was relevant under *People* v. *Cowles* (1929), 246 Mich 429.[7]

---

[6] The federal courts are precluded by statute from ordering government disclosure in advance of trial of prospective witnesses' statements. 18 USC § 3500. We are not so limited. If we were to adopt a judicial rule similar to the federal statute we would have to consider whether disclosure should be made after the direct testimony at a preliminary hearing as well as at trial, a problem which does not exist in federal practice. Until the legislature by statute or the Supreme Court by rule or decision speaks on the subject or until we are presented with a case requiring our ruling we say only that it is within the sound discretion of the trial judge.

[7] "Evidence offered to prove acts of the girl showing sexual per-

As to the balance of the requested discovery by
defendant, the record is inadequate for us to make
any rule precise enough to be of any use in the future
administration of criminal justice. It would appear
that under *People* v. *Smallwood* (1943), 306 Mich
49, the complainant's experience with juvenile au-
thorities was a proper subject of trial inquiry. Per-
haps the records would contain something that would
have a legitimate bearing on the credibility of the
complainant. But we can only guess because these
records are not before us. We suggest that before
retrial of this case, the trial judge inspect the ju-
venile records as well as the other materials re-
quested by the defense, and after determining what
portions should be discoverable to the defense, pre-
serve a copy of what is refused in the event that his
rulings are reviewed.

### *IV. The Court Erred in Failing to Confine the Jury's Deliberations to the Date Alleged in the Information*

The information charged that the offense occurred
"on or about the 28th day of September, 1965." All
of the testimony of the people which tended to es-
tablish the crime fixed the date as September 28.
Complainant knew "positively" that the date was
September 28, a Tuesday.

Shortly after the jury retired the foreman sent
the following inquiry to the court:

"Our question is, was the 28th of September es-
tablished as the night of the alleged crime, or was it

version and lascivious conduct, inclusive of exposure of her person to
school boys, was excluded. We think the testimony should have been
received, not in extenuation of rape, but for its bearing upon the
question of the weight to be accorded the testimony of the girl
and the question of whether the mind of the girl was so warped by
sexual contemplation and desires as to lead her to accept the imagined
as real or to fabricate a claimed sexual experience." *Id.*, p 431.

on or about the 28th of September? There is dispute about the judge's instructions, if it had to happen on the 28th, according to testimony."

After conferring with counsel, the trial judge, recalled the jury and gave a supplemental instruction, part of which was:

"If you would find in this case, and there is some evidence to support that, and that is your function as the judge of the facts, if you would find that it occurred on some other date and you can substantiate that finding, and you find all the other elements, then, it wouldn't matter if it happened on some other date. But, you have to analyze that problem carefully—was there any other date that the proofs show it could have happened or did happen.

"There's something else I was going to say—this latest case, let me give you it because I want you to fully understand this, the latest case, being the *People* v. *King*, 365 Mich 543, the holding in that case is as follows: 'Where there is a slight uncertainty as to or mistake as to the actual date of the specific occasion or offense intended to be relied upon, some variance between the charge and the proofs is not fatal if time is not of the essence of the offense,' and, I told you, time is not of the essence of this offense."[8]

To repeat, as the trial judge did, that time is not of the essence did not respond to the point raised by the jury, *i.e.*, to convict must they confine their de-

---

[8] "[W]e caution bench and bar, as we did in *Frederick* v. *City of Detroit*, 370 Mich 425, 431, 432, that the language we use in this appellate opinion may not be adopted uncritically for purposes of jury instruction. What we write is written for minds drilled in the ways of the common law, skilled in applying legal abstractions to evidentiary facts, and not for the instruction of jurors. That frequently difficult task of jury instruction rests in the first instance with the trial judge who must translate our legal rulings, cast in the law's shorthand abstractions, into language comprehensible by the jury and directly relevant to the evidentiary facts of the case being tried." *In re Wood Estate* (1965), 374 Mich 278, 292.

liberations to whether the alleged offense occurred on September 28. Based on all the testimony at trial they should have been so confined in clear instructions, *People* v. *Hunter* (1965), 374 Mich 129. *Cf. People* v. *King* (1962), 365 Mich 543.

"It is well settled that the prosecution is entitled to some latitude in fixing the date, but, having once identified and selected a particular transaction, it must then stand or fall by the election." 1 Gillespie, Michigan Criminal Law and Procedure (2d ed), § 349.

The instruction allowed the jury to find that the offense occurred on some date other than September 28, when in fact there was nothing in the record to support such a finding. This was particularly prejudicial here because the defendant and three of his witnesses were able to account for his activities on the evening in question with testimony in the nature of alibi.[9]

The objection to the supplemental charge was properly saved in a motion for new trial. GCR 1963, 516.4.

### V. The Evidence Against the Defendant, Although Weak, was Sufficient to Sustain the Verdict

With respect to identification of defendant, complainant testified both on direct and cross-examination that "I wasn't sure"; "I am pretty sure, but I'm not all positive"; I chose him "because he looked familiar to me." Her identification was made only after she had looked at a photograph of the defendant shown her by the police. "I knew of the men that I saw in that picture that I was going to pick

---

[9] This testimony disclosed that defendant was at his office with the three witnesses preparing for his departure on a hunting trip the following morning.

Brocato because I put two and two together and he was the only older man."

· The complainant, when her escapades were revealed, was sent to a special school and was thereafter periodically treated by psychiatrists at the State hospital where she was residing at the time of trial.

Two psychiatrists who had examined the complainant testified for the defense. Dr. Emanual Tanay stated that in his opinion the complainant was suffering from sexual deviation, a personality pattern disturbance. Dr. Tanay referred to the complainant's many abnormal sexual activities and her shameless, aggressive pursuit of older men. He explained that this pursuit was the result of a desire to get older men in trouble. Such, he concluded, were attempts to "get even" vicariously with her stepfather. When asked whether the complainant could be believed under oath, Dr. Tanay testified that in certain areas she could not.

Dr. Joseph McCarthy testified that the symptoms which the complainant manifested pointed toward an acute mental disorder, classified as a schizophrenic reaction. Such persons, he said, can easily be led and while they may be depended upon to tell the truth as they see it, they misinterpret things. Accordingly, he stated that he would doubt the truth of some of her testimony at trial.

Dr. Edwin Williamson and Dr. William Decker, psychiatric experts called by the prosecution, both stated that in their opinion complainant did not hallucinate or fantasize. Dr. Williamson conceded that the complainant had a definite personality disturbance and needed to be incarcerated in a mental institution.

The defendant was 57 years old, had been a practicing attorney for some 25 years, and had no crim-

inal record. He had been married some 15 years to his present wife and had three children by a previous marriage. He produced a number of witnesses to testify to his good character. He denied the charges and denied ever having met the complainant. Three witnesses testified they were with the defendant at the time complainant said the offense occurred.

There are special circumstances which the law sometimes recognizes as requiring more than the uncorroborated testimony of one person to convict.[10] But Michigan has rejected the rule followed in some jurisdictions that the complainant's testimony must be corroborated in order to sustain a conviction of rape. *People* v. *Inman* (1946), 315 Mich 456. The rationale of this case, rejecting the need for corroboration of a 9-year-old complainant's testimony, applies equally to an indecent liberties prosecution. The evidence here, consisting of the uncorroborated testimony of complainant, although weak, was legally sufficient to convict the defendant.

## VI. The Misconduct of the Prosecutor Deprived the Defendant of a Fair Trial

A quotation from *State* v. *Tolson* (1957), 248 Iowa 733 (82 NW2d 105), will set the theme for this portion of our opinion.

"It is sometimes said that error 'crept' into the trial of a lawsuit. Not so in the case at bar. It marched in like an army, with banners, and trumpets. It was escorted, and emphasized, and aggravated by the attorney for the State."

It is the duty of the prosecutor to see that the defendant has a fair trial and to protect the interest of the people, who are as concerned with protecting

---

10 For example, see Wigmore on Evidence (3rd ed), § 2056, dealing with the uncorroborated testimony of an accomplice.

the innocent as with convicting the guilty, *People* v. *Evans* (1888), 72 Mich 367. In this sense a prosecuting attorney stands in a different position than private counsel. Where, as here, the offense charged is highly inflammatory, the prosecutor must be especially cautious. *People* v. *Askar* (1967), 8 Mich App 95.

The prosecutor here made every conceivable effort to prevent the defendant from having a fair trial. The record is replete with instances where he flagrantly violated the rulings of the court, improperly argued with and embarrassed witnesses, testified in the guise of examination or cross-examination and introduced and referred to hearsay testimony. Defendant's liberal beliefs made him a controversial figure in a conservative community. Such differences were molded by the prosecution into armaments of prejudice dispatched to persuade the jury to convict the defendant on the basis of character.

We will consider some of the prosecutorial misconduct here but with a warning that upon a retrial of this case this opinion should not be intended as a complete catalogue of the prejudicial misconduct which occurred in this trial.

## A. *The Improper Reference to a Polygraph Test*

On redirect examination of the complainant the prosecutor asked:

"*Q.* Now, Lana, in the course of the investigation, were you asked to take a lie detector test?
"*A.* Yes, I was."

Upon defense counsel's immediate objection, the trial judge excused the jury in order to deliberate with counsel on a proper ruling. After extended discussion, the trial court ruled that the question was the initial step in an improper direction and was

"treading on dangerous ground." With that warning, the objection of defense counsel was sustained.[11]

Nevertheless, in direct contravention of the court's ruling, the prosecutor subsequently asked of the policewoman assigned to the case:

"*Q*. Miss Whitfield, one last question: In the process of your investigation of this case and to ascertain the truthfulness of Lana Jane Robinson, was she at any time—*get ready, Mr. Bucknell* (defense counsel)—offered a polygraph examination?" (Emphasis supplied.)

It is rare indeed that an appellate court is confronted with such an openly disclosed intent on the part of a trial attorney to place before a jury improper and prejudicial testimony or such flagrant disregard of a ruling by the court. Usually such openly improper conduct is handled by the trial judge either by his contempt power or, at the very least, his power to grant a new trial in the interests of justice.[12]

Subsequently, the policewoman was being cross-examined by defense counsel, Mr. Bucknell:

"*Q*. Well what other matters would there be besides the details of what took place?

"*A*. Initially, before the police would jump into an investigation of this kind, we want to know what it is we are working with. If there is anything to this or if there could be anything to it. We took precautions initially, before any investigation was

---

[11] The only correct ruling. Neither the results of such tests nor any reference to them has ever been proper in this State. See, for example, *People* v. *Frechette* (1968), 380 Mich 64; *People* v. *Mc-Laughlin* (1966) 3 Mich App 391; *People* v. *Paul F. Baker* (1967), 7 Mich App 471.

[12] Objection to the question was sustained. But the damage was already done. Defense counsel should have moved for and been granted a mistrial. The fact that he failed to do so does not prevent us from reversing the conviction. *People* v. *Ignofo* (1946), 315 Mich 626.

done, to see that we had something to work with, something that should be investigated.

"*Q.* So you depend upon Miss Robinson—

"*A.* And scientific methods of investigation.

"*Q.* Scientific methods of investigation?

"*A.* Yes.

"*Mr. Bucknell:* That's all.

"*Re-direct Examination*

"*By Mr. Burge:*[13]

"*Q.* Well, Miss Whitfield, what scientific methods are you talking about?

"*A.* Initially, Miss Robinson was run on a polygraph. This is general procedure.

"*Mr. Dalzell:* He opened the door again.

"*Mr. Bucknell:* I didn't open up anything.

"*The Court:* She answered the question, didn't she?

"*Mr. Burge:* I believe she did. I don't know if the jury heard. *Miss Fagan, would you read it back?*

"*The Court: That is the end of it.*

"*The Reporter:* Do you want me to read it?

"*The Court:* It got in. You asked it be stricken?

"*Mr. Bucknell:* Yes, I ask it be stricken.

"*The Court:* You used the word 'scientific.' I'm going to leave the answer in. *I want the matter foreclosed at this point.*

"*Mr. Burge:* I won't pursue it any further, your Honor. *Miss Fagan, would you read the answer for the jury, loud and clear?*

"*Mr. Bucknell:* Well, that is compounding the situation." (Emphasis supplied.)

The court was in error in allowing the answer to stand. Defense counsel did not open the door. The reference to "scientific methods of investigation" was first made by the policewoman and was not at

---

[13] The prosecution was handled by the prosecuting attorney, Mr Burge, and his assistant, Mr. Dalzell.

all pursued by the defense counsel. On the contrary, he promptly terminated his questioning.

Much later in the trial during the people's rebuttal, the prosecutor asked one of his witnesses if he had taken a polygraph test and the witness answered, without objection, that he had. Putting the question to the witness was not only error but utter disregard of the court's earlier ruling and demonstrated the prosecutor's lack of good faith.

### B. *Improper Reference to Guilty Pleas Entered by Others*

The following occurred during the prosecutor's cross-examination of one of the defense psychiatrists:

"*Q.* \* \* \* Now, Doctor, there were 17 men arrested, charged, preliminary examinations that you never read except one. Now, remember that fact. Six of those men have already pled guilty—

"*Mr. Bucknell:* Now, I'm going to object to that,—

"*Mr. Dalzell:* All right. I'll withdraw that, your Honor.

"*The Court:* Yes. The jury will disregard it.

"*Mr. Dalzell:* I'll withdraw it.

"*Q.* What if I told you that six of those men have already pled guilty?

"*A.* I would say it confirms my opinion, that this girl in fact is suffering from a sexual perversion that in her young age—

"*Q.* Do you think those six men are suffering with the same fantasy she had?"

Once again, the prosecutor, after acknowledging the impropriety of his question and after hearing the adverse ruling of the court, proceeded a second time to pursue a highly prejudicial matter. Once was enough for a mistrial. *People* v. *Patrick* (1943),

305 Mich 327. See, also, 2 Wharton's Criminal Evidence (12th ed), § 439.

### C. *Improper Testimonial Questioning by the Prosecutor*

The complainant had testified that the man who had taken indecent liberties with her was rather hairy on his back and arms. The prosecutor requested the defendant to strip to the waist in the presence of the jury and he complied. Apparently disappointed with the physical evidence thus produced, the prosecutor asked defendant if he had used a depilatory. He then continued:

"*Q.* Now, defendant, isn't it also a fact that you have lost a substantial amount of hair since the time I saw you in a bathing suit at the Gull Lake Country Club at the annual lawyers' outing?

"*A.* You would have to tell me when that was. I haven't been to one in about four or five years.

\*       \*       \*

"*Q.* Well, defendant, on this particular outing, it was a nice day, a number of us were in swimming. We were all sitting around the water in chairs, in our swimming suits, having a few cocktails, and you were in your bathing suit.

"*A.* I don't recall the occasion."

This was not questioning by the prosecutor— this was testimony by the prosecutor and highly improper. *People* v. *Treat* (1889), 77 Mich 348; *People* v. *Nichols* (1909), 159 Mich 355; *Berger* v. *United States* (1935), 295 US 78 (55 S Ct 629, 79 L Ed 134); *People* v. *Besonen* (1966), 4 Mich App 131.

### D. *Improper Impeachment of Witness*

A prosecution witness, Larry Eldridge, on *direct* examination denied having ever taken Lana to defendant's law office or having been in her company

with defendant. Under the people's theory of the case, the prosecution was required to call Eldridge as a *res gestae* witness. After a proper foundation was laid, he was subject to impeachment (CL 1948, § 767.40a [Stat Ann 1954 Rev § 28.980(1)]) and for this purpose Peter Klobucher was called as a witness. He had been intimate with complainant and by this time had pled guilty to her complaint of statutory rape (a fact which should not be brought out by the people on any retrial of this case). Over defendant's objection he was allowed to testify:

"*Q.* (*continuing.*) Did Mr. Eldridge tell you what transpired at the apartment?

"*A.* He said that he and Mr. Brocato had intercourse with Lana.

"*Q.* He said he had intercourse with Lana?

"*A.* Yes.

"*Q. Mr. Brocato* and Eldridge had intercourse with Lana?

"*A.* Something similar to that, not in those exact words.

"*Q. What did he tell you in reference to Mr. Brocato?*

"*A.* He said that he had tried to have intercourse with her, and got excited and had a climax before he had a chance to do anything." (Emphasis supplied.)

No proper foundation was laid for this impeachment testimony because Eldridge was never asked by the people if he had made such statements to Klobucher. But lack of foundation is not the essential error we are discussing. The people knew when Eldridge was asked the question on direct examination, that he would deny improper conduct with the complainant.[14] They could not generate

---

[14] Eldridge was being prosecuted in a separate case and had pleaded not guilty.

a proper foundation for Klobucher's highly preju-
dicial and completely hearsay testimony by asking
the questions first of Eldridge. This would deprive
defendant of his right of confrontation and his right
to cross-examine the witnesses on the testimony re-
ceived against him.

In *Douglas* v. *Alabama* (1965), 380 US 415 (85 S
Ct 1074, 13 L Ed 2d 934), the Supreme Court held
that the Sixth Amendment right of confrontation
was applicable to the states as part of the concept
of due process embodied in the Fourteenth Amend-
ment. In *Douglas,* an accomplice of the defendant,
called by the people, refused to testify, asserting
his Fifth Amendment rights. The trial judge al-
lowed the prosecution to introduce the accomplice's
confession which implicated the defendant. The
Supreme Court reversed the conviction, saying:

"Since the Solicitor was not a witness, the infer-
ence from his reading that Loyd made the statement
could not be tested by cross-examination. Similarly,
Loyd could not be cross-examined on a statement im-
puted to but not admitted by him. Nor was the op-
portunity to cross-examine the law enforcement offi-
cers adequate to redress this denial of the essential
right secured by the Confrontation Clause. Indeed,
their testimony enhanced the danger that the jury
would treat the Solicitor's questioning of Loyd and
Loyd's refusal to answer as proving the truth of
Loyd's alleged confession.   *   *   *

"Hence, effective confrontation of Loyd was pos-
sible only if Loyd affirmed the statement as his.
However, Loyd did not do so, but relied on his privi-
lege to refuse to answer. We need not decide
whether Loyd properly invoked the privilege in
light of his conviction. It is sufficient for the pur-
poses of deciding petitioner's claim under the Con-
frontation Clause that no suggestion is made that

Loyd's refusal to answer was procured by the petitioner." *Id.,* p 420.

See, also, *People* v. *Durkee* (1963), 369 Mich 618.

In aggravation of this already prejudicial error, the prosecution requested and was given a theory instruction which, in part, could be justified only by treating Klobucher's statement of what Eldridge said as substantive evidence. Moreover, the court failed to instruct the jury on the limited use of impeachment testimony which it should have done even in the absence of such a request. *People* v. *Eagger* (1966), 4 Mich App 449.[15]

### E. *The Cross-examination of Defendant was Highly Prejudicial*

The prosecutor opened his cross-examination of defendant:

"*Q.* You do believe in God?
"*A.* Oh, yes.
"*Q.* So that there is no question about the oath you have taken here?
"*A.* Oh, no."

This was highly improper and in violation of CLS 1961, § 600.1436 (Stat Ann 1962 Rev § 27A.1436), which provides: "No witness may be questioned in relation to his opinions on religion, either before or after he is sworn."

The prosecutor then cross-questioned defendant about allegations made in a complaint for divorce by his former wife some 15 years before, wherein she had charged that he was a communist and sought to teach the children the doctrine of communism. Even though no objection was made,[16] the questioning was

---

[15] We have already noted that defendant failed to object to the instructions and could not claim this alone as error.

[16] When this questioning started, the court quite commendably invited defense counsel to object. The invitation was declined. This

highly improper and had the effect of getting hearsay testimony (somewhat stale, at that) before the jury. *Hollywood* v. *Reed* (1885), 57 Mich 234; *Mead* v. *Randall* (1896), 111 Mich 268.

The following also occurred during defendant's cross-examination:

"*Q.* And isn't it true, defendant, that in 1949 there was a warrant issued for your arrest by the prosecuting attorney, assistant prosecuting attorney Gordon Kriekard, for nonsupport, and that that complaint was signed by Irene Brocato?

"*A.* I don't know there was any warrant. I never knew there was a warrant.

"*Q.* Weren't you arrested for that charge?

"*A.* I was never arrested, never arrested, never arraigned at all. The charge was absolutely false.

"*The Court:* No objection on that, Mr. Bucknell?

"*Mr. Bucknell:* Yes, I'm going to ask it be stricken.

"*The Court:* Yes, members of the jury, disregard that last question and answer. The prosecutor should know better than that. You can't ask a man on the stand if he has been arrested, the theory being you got to say 'arrested and convicted' or you can frame the question in a different way, the point being that a man can be unjustly accused. Asking a man if he was simply arrested—

"*Mr. Burge:* Well, now, your Honor, I fully appreciated what you are saying, at least until the Court of Appeals has just recently proved that was good law. There is an appellate decision that says we can ask about arrests without convictions, number 1. Secondly, your Honor, the question was not asked in terms of this man's criminal record. The

---

may have been good trial strategy. But having adopted the strategy, defendant has no right to raise the point here. *Cf. Henry* v. *Mississippi* (1965), 379 US 443 (85 S Ct 564, 13 L Ed 2d 408), *reh den* 380 US 926 (85 S Ct 878, 13 L Ed 2d 813).

question was asked with respect to his statement about the support of his family.

"*The Court:* I'm not going to argue with you.

[Here follows a page and a half of argument between the court and the prosecutor]

"*Q.* All right, defendant, isn't it true that your son Gene, had on occasion called the Kalamazoo police department in connection with your divorce proceedings, in which it was alleged that you were interfering with the family life of Irene Brocato and your children?

"*A.* Not to my knowledge he never did.

"*Q.* Aren't there a number of show cause orders in that file, defendant, dealing with contempt proceedings?

"*A.* Against Mrs. Brocato, yes, several.

"*Q.* How about yourself, defendant?

"*A.* There was one occasion Mrs. Brocato refused to let me see my children, and I at that time took the position it was up to the prosecuting attorney to see that I got my visitation rights as provided in the court order. The prosecutor didn't see fit to do that, and he took the position that I wasn't going to pay. However, there was never any contempt found against me, and I paid when I was ordered to.

"*Q.* Is this the occasion, then, defendant, in which your son called the police?

"*A.* Not to my knowledge; to my knowledge he never did.

"*The Court:* Mr. Brocato, how long ago was that we are talking about?

"*The Witness:* About 15 years ago.

"*The Court:* I thought so; I just wondered.

"*Mr. Burge:* I appreciate this. *A court is supposed to be impartial here. The question you have just asked here clearly appears to me, and I want this record to show that, that question was designed to give, accord to this witness some special benefit.*"
(Emphasis supplied.)

Thereafter, the prosecutor asked the following:

"*Mr. Burge:* Have you ever been arrested and convicted [*sic*] for drunk driving in Battle Creek, defendant?

"*Mr. Bucknell:* I object to that.

"*The Court:* What was it?

"*Mr. Burge:* Arrested for drunk driving * * * . I am under the impression that the Court of Appeals for the State of Michigan recently expressed an opinion that it was not error and it is a well-used technique to impeach a witness as to arrests, notwithstanding the end result of that case. Whether they have been convicted or not is not the issue, just an arrest."

The people attempt to justify the foregoing cross-examination by referring to *People* v. *Hoffman* (1965), 1 Mich App 557, for the proposition that questions about arrests may be asked. But *Hoffman* said they could be asked only *in the discretion of the trial judge.* Here the trial judge, in the exercise of his discretion, decided that these questions not be asked and the prosecutor plainly ignored the trial judge's orders by conduct which we have no hesitation in characterizing as contemptuous.

But we have something further to say about the *Hoffman Case.* The writer of this opinion signed the *Hoffman* opinion and now confesses that he was wrong.[17] It is based upon a misreading of *People* v. *Foley* (1941), 299 Mich 358. In *Foley,* the defendant was charged with accepting the earnings of a prostitute. The defendant testified, on direct examination, that she had never seen the alleged prostitute "do anything wrong at my place. She worked as a maid for me." On cross-examination, the prose-

---

[17] Justice Jackson in *McGrath* v. *Kristensen* (1950), 340 US 162 (71 S Ct 224, 95 L Ed 173), in confessing to a change in view on a point before him, quoted Lord Westbury who "rebuffed a barrister's reliance upon an earlier opinion of his Lordship [by replying] 'I can only say that I am amazed that a man of my intelligence should have been guilty of giving such an opinion.'"

cutor was allowed to inquire about defendant's arrests with the alleged prostitute. In approving of this cross-examination, the Supreme Court was careful to point out that the testimony was not admitted to impeach the *credibility* of the defendant but to impeach her direct *testimony*. Even under these circumstances the court, apparently recognizing the grave danger that such evidence would be used improperly by the jury, said such questioning would be allowable only in the discretion of the trial judge.

*People* v. *MacCollough* (1937), 281 Mich 15, has been cited as authorizing inquiry as to arrests and charges of crime. But the cross-examination complained of there and allowed as being within the outer limits[18] of the trial judge's discretion was directed not to the arrests of the defendant on trial, but to those of his witnesses. To the same effect, see *People* v. *Miniear* (1967), 8 Mich App 591, 598, which also involved not a defendant on trial but a witness called by the people.

We now hold that a defendant testifying at his own trial may not be asked if he has been arrested or charged with crime, where the arrest or charge has not resulted in a conviction and where the only purpose of the questions is to impeach the defendant's credibility as a witness.[19] Where credibility is the only issue, the probative value of arrests and charges, unsubstantiated by a conviction, is slight at best. When weighed against the great danger that the jury, despite careful instructions,[20] might misapply such evidence, the scales of justice tip in

[18] "[I]n the opinion of this Court, it would have been a wiser exercise of discretion to have excluded them." *Id.*, p 24.

[19] This is in accord with the weight of authority. See 3 Wharton's Criminal Evidence (12th ed), § 884.

[20] "The naive assumption that prejudicial effects can be overcome by instructions * * * all practicing lawyers know to be unmitigated fiction." *Krulewitch* v. *United States* (1949), 336 US 440, 453 (69 S Ct 716, 93 L Ed 790, concurring opinion).

favor of exclusion, *United States* v. *Beno* (CA 2, 1963), 324 F2d 582.

The defendant was also questioned about conversations and meetings he had with his attorneys,[21] and was then asked in the presence of the jury if he would be willing to waive any privileges he had in connection with his relationship with his attorneys. Objections to this line of questioning were sustained by the court. Despite the ruling, the prosecutor, apparently desiring to complete his picture to the jury that one of defendant's attorneys could give some damaging testimony, then asked, "Isn't it a fact defendant that, in effect, attorney Eugene Field was fired by you?" Objection to this question was also sustained by the court, but the prosecutor's picture had already been painted and exhibited to the jury.

The attorney-client privilege is fundamental to our system of jurisprudence. The privilege is destroyed if improper inference can be drawn from its exercise. That apparently was the purpose of the prosecutor in calling for a waiver in front of the jury and this constituted reversible error. *People* v. *Dahrooge* (1912), 173 Mich 375.[22]

"[I]n a criminal case liberty is at stake and the defendant must not be compelled to imperil the same by an appeal to the rule of exclusion and be left in the attitude of suppressing evidence." *People* v. *Werner* (1923), 225 Mich 18, 23.

The prosecutor in his brief here states that the questions were asked to expedite the trial and eliminate prejudice to the defendant by obviating the

---

[21] One of them was referred to as "a big Chicago lawyer by the name of Bellows" an obvious and improper appeal to provincialism.

[22] Parity of reasoning requires condemnation of the introduction of evidence that defendant refused to consent to a search of his premises at the time of his arrest because it likewise permits an adverse inference to be drawn from the exercise of a constitutionally protected right.

necessity of asking a series of otherwise objectionable questions. We fail to comprehend the reasoning of this contention. The simple answer is that the prosecutor could ask for the waiver off the record or at least in the absence of the jury.

In summation, the prosecutor's demeanor at trial blatantly transgressed the rules of conduct imposed on him as a public officer. The studied manner in which he introduced error in the presence of the jury was a violation of his public trust. In a criminal prosecution, that trust demands only that justice be done. "It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger* v. *United States, supra,* p 88. See *People* v. *Besonen, supra; People* v. *Askar* (1967), 8 Mich App 95; 2 Gillespie, Michigan Criminal Law and Procedure (2d ed), § 617; 24 Mich L Rev 834 (1926).

We feel compelled to note, also, that the trial court failed to discharge his statutory duty to control all proceedings during trial and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved. CL 1948, § 768.29 (Stat Ann 1954 Rev § 28.1052). Great care should be exercised by the trial court as well as the prosecuting attorney to insure that no statement be made in the presence of the jury which would jeopardize a defendant's right to a fair trial. *People* v. *De Lano* (1947), 318 Mich 557. The trial court is not a mere figurehead. He is charged with directing important public business. To this end he should not hesitate to control the scope of the evidence when, as here, immaterial or prejudicial matters are being introduced for a purpose clearly extraneous

to the ascertainment of innocence or guilt. He must not hesitate to keep the conduct of the attorneys within the boundaries of legitimate argument and to promptly check them when they exceed it.

The rulings of the court are to be followed and when they are not the court should exercise its power of contempt or at least reprimand the offending person in the jury's presence. Most of the trial court's rulings on the points we have mentioned were eminently correct. The error occurred because the prosecution was allowed to ignore them with impunity.

Defendant's counsel is not without some blame. Some of what we have noted went in without objection. When counsel was successful in objecting to questions, the mere asking of which was prejudicial, he should have moved for a mistrial. Failing in that, he should have asked that the prosecutor be reprimanded and the jury instructed. Counsel cannot sit back and harbor error to be used as an appellate parachute in the event of jury failure. We are convinced counsel did not act from such motives here. But he needlessly[23] imperiled his appeal by failing to protect the record as we have noted.

Defendant is entitled to that which he has not yet had, a fair trial. It is suggested, in view of the testimony in this record to the effect that the details of this case were well known in Kalamazoo and that the case was a celebrated one and now involves another trial, that the court, on retrial, consider whether or not a change of venue should be ordered, if the defendant should so move.

Reversed and remanded for new trial.

All concurred.

---

[23] We are speaking with the hindsight of an appellate court. Perhaps counsel assumed (correctly as we have noted) that the prosecution had already committed serious reversible error which was properly saved for appellate review and further objections to the prosecutor's actions would only hinder his chances with the jury.