PEOPLE v DOWNS

PEOPLE v KING

1. CRIMINAL LAW—DEFENDANT TESTIFYING—IMPEACHMENT—PRIOR CONVICTIONS.

In Michigan the courts are committed to limiting misdeed impeachment of a defendant-witness in a criminal trial to actual criminal convictions, and to only such convictions as in the trial judge's discretion appropriately balance the prejudicial effect of impeachment against probative relevance of the prior convictions to the issue of credibility; limitations already existing on such impeachment by the ordinary tests of relevance and the conviction-only rule are sufficient to protect the defendant-witness against prejudice.

2. CRIMINAL LAW—DEFENDANT TESTIFYING—IMPEACHMENT—APPEAL AND ERROR—FAILURE TO OBJECT.

The appellate court need not consider whether impeachment of the credibility of a criminal defendant who took the stand in his own defense by cross-examining him regarding certain prior convictions was improper where no objection was made at trial and there is no clear showing of a resulting miscarriage of justice.

Appeal from Chippewa, William F. Hood, J. Submitted Division 3 December 4, 1972, at Detroit. (Docket No. 13200.) Decided February 22, 1973. Leave to appeal applied for.

Kenneth G. Downs and Robert D. King were convicted of statutory rape. Defendants appeal. Affirmed.

*Carl Ziemba,* for defendant Kenneth G. Downs on appeal.

*David A. Goldstein,* Assistant State Appellate Defender, for defendant Robert D. King.

REFERENCE FOR POINTS IN HEADNOTES
[1, 2] 58 Am Jur, Witnesses § 734 *et seq.*

Before: LESINSKI, C. J., and J. H. GILLIS and PE-
TERSON,* JJ.

PETERSON, J. Defendants were convicted by jury
of statutory rape. MCLA 750.520; MSA 28.788. The
only question of merit on appeal involves cross-
examination inquiry into the criminal record of
each defendant.

It has been a touchstone of our jurisprudential
faith that cross-examination is the *sine qua non* to
test the quality of testimony and thereby permit
the trier of fact to give it the weight it deserves. It
is not a testing of mere words but of their source;
nothing would seem more obvious than that the
testimonial word can be assigned weight only with
regard to *who* has spoken it.[1]

The axiom "What you are speaks louder than
what you say", embodies a folk wisdom more
venerable than our historically recent common
law of evidence. So, Socrates observed that "a man
is as his deeds". Accordingly, by this common-
sense bit of common law, we recognize the peril of
accepting without scrutiny the portrait of the
witness, drawn in the most favorable image by the
art of sponsoring counsel and the witness's own
self-esteem. The genuineness of the image, or at
least its completeness, must be challenged. The
trier of fact should be made to know the capacity
of the witness to make an observation, to remem-
ber a past event accurately, to be fair, and to be
truthful. Bearing on the latter, it has been thought
that the character of the witness as evidenced by

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] It has been sometimes suggested that this is a truth more obvious
to the trial bar and bench than to writers and appellate judges
immersed in cold transcripts. Nonetheless, appellate factual review is
framed by rules corollary to this premise, recognizing that credibility
is the essence of fact finding and the exclusive province of the trial
court or jury.

his respect for law and the rights of others was a relevant area for cross-examination.[2]

The right to impeach by showing misdeeds of the witness has been under attack, particularly where the witness is a criminally prosecuted party. So, it has been suggested that such cross-examination exposes the defendant-witness to the risk of prejudice in the eyes of the jury; that the rule "unconstitutionally chills a defendant's right to take the stand in his own defense";[3] and that since the impeachment goes to credibility, misdeeds which demonstrate only general lack of character or anti-social traits less than a perjurious state of mind, are not sufficiently relevant to warrant inquiry when weighed against the risk of prejudice against the defendant. And so the fiction of the honest thief and the prostitute with a heart of gold are removed from the western novel into the respectability of appellate court decisions. They go hand in hand with the further fiction that our great fact-finding institution in which we avow such confidence, our practical and common-sense citizen jury, has no sense of proportion or fairness in hearing the less than saintly witness, but at the same time can well and truly weigh his testimony without knowing if, and how, he lost his wings and halo.

So, the simple test of relevance has been abandoned, and various courts have held that there may be no such inquiry into misdeeds save as confirmed by convictions; that, while a witness may "explain" his conviction, the prosecution may

---

[2] The proposition posits, of course, that the conduct inquired about be relevant, a supposed prerequisite to admission of any evidence. *People v Simard,* 314 Mich 624 (1946). And, implicit in its purpose, it may not be abused by inquisitorial misconduct designed to present a false portrait or build prejudice, *e.g., People v Di Paolo,* 366 Mich 394 (1962).

[3] *People v Farrar,* 36 Mich App 294, fn 20 (1971).

not; that only felony convictions may be used to impeach; that only convictions indicative of an untruthful propensity may be so used; that there may be no impeachment until the defendant-witness has first offered evidence to support his credibility;[4] and even that there may be no such impeachment whatever.[5] We note that a Federal due-process constitutional protection also exists in that convictions constitutionally infirm may not be used for impeachment purposes. *Loper v Beto,* 405 US 473; 92 S Ct 1014; 31 L Ed 2d 374 (1972).

In Michigan, we are now committed to limiting misdeed impeachment of the defendant-witness to actual criminal convictions,[6] and to only such convictions as in the trial judge's discretion appropriately balance "the prejudicial effect of impeachment" against "the probative relevance of the prior conviction to the issue of credibility".[7]

We are now asked to go the last step and bar such impeachment entirely, following *State v Santiago,* 53 Hawaii 254; 492 P2d 657 (1971). Notwithstanding the eloquent briefs of the defendants herein, we are not so persuaded. We think the limitations already existing on such impeachment by the ordinary tests of relevance, the *Luck-Gordon* test adopted by *People v Farrar,* 36 Mich App 294 (1971), and the conviction-only rule of *People v Brocato,* 17 Mich App 277 (1969), are sufficient to

---

[4] This test, suggested by the proposed Uniform Rules of Evidence Act (Rule 21) and the Model Code of Evidence (Rule 106), overlooks the effect of the testimonial oath itself as an assertion of credibility by the witness, embodied in some jurisdictions in a presumption of truthfulness of testimony under oath.

[5] *See* 70 Yale LJ 763 (1961); 37 Cinci L Rev 168 (1968); 51 ABAJ 1017 (1965), and 46 FRD 161, 298 (1969), for discussions of these viewpoints.

[6] *People v Brocato,* 17 Mich App 277 (1969).

[7] The test set out in *Luck v US,* 121 US App DC 151, 156; 348 F2d 763, 768 (1965), and expanded in *Gordon v US,* 127 US App DC 343; 383 F2d 936 (1967), adopted by *People v Farrar,* 36 Mich App 294 (1971).

protect the defendant-witness against prejudice. To go farther would effectively permit an accused to be a witness on his own behalf, able to conceal a part of his identity, and secure in the unearned posture of an upright citizen. As to the usefulness to the jury of that part of the identity of the defendant-witness, consider the impeachment of King set out in its entirety in the appendix hereafter. Could his credibility really be judged if this part of his identity were to be concealed from the jury?

The question, then, is whether there was error in the impeachment of the defendants under existing safeguards. In this pre-*Farrar* trial, no proper objection was made to the impeachment of King and no objection at all to the impeachment of Downs. The trial judge thus was not asked to anticipate *Farrar* and exercise his discretion under the *Luck-Gordon* rule to consider whether some of the defendants' convictions ought not to be the subject of cross-examination. As a result the jury heard that Downs had two disorderly convictions in addition to two convictions for breaking and entering, and that King's long record included misdemeanors of questionable relevance. Too, King's non-responsive predilection for saying that he "got picked up" for a particular offense was in several instances not pursued to insure that there was in fact a conviction, and King himself volunteered a question suggesting that he was somehow associated with a jailbreak.

No objection having been properly made at trial, we do not consider these questions now in the absence of a clear showing that there was a resulting miscarriage of justice. To the contrary, the record clearly sustains the convictions. Other allegations of error are without merit.

Affirmed as to both defendants.

All concurred.

## APPENDIX

*Q.* Prior to that time, Mr. King, have you ever been convicted of any other offenses other than traffic?

*Mr. Henderson [for defendant]:* If the court please, I would object to that. I think the question should be of any sex offenses, not any general offenses.

*The Court:* The objection is overruled. He may ask if he has been convicted of any offense.

*Q. (by Mr. Elliott, assistant prosecutor):* You may answer the question, Mr. King.

*A.* Yes, I got picked up. Assault and battery.

*Q.* When was that?

*A.* I think it was about a month or so before I went to Utah in December.

*Q.* You were convicted on that?

*A.* I was found guilty on it.

*Q.* Other than assault and battery, were you ever convicted?

*A.* I got picked up on—I think it was last part of '63.

*Q.* And what was that for?

*A.* Picked up for breaking and entering.

*Q.* Is that all?

*A.* When I got picked up for breaking and entering I went to court. After court we left there, and I was picked up again ten days later on a perjury charge.

*Q.* Convicted of perjury?

*A.* Yes.

*Q.* Did you have any other convictions?

*A.* Car theft, but that was back in the early '60s.

*Q.* Was that prior to this perjury charge you're talking about?

*A.* No, it wasn't.

*Q.* Pardon?

*A.* No.

*Q.* Any others?

*A.* You mean in Sault, Michigan, or where?

*Q.* Anywhere?

*A.* I got picked up in Utah.

*Q.* When was that?

*A.* Couple of months before I came back here, I guess.

*Q.* What was that for?

*A.* Strong-arm robbery.

*Q.* Strong-arm robbery?

*A.* Right.

*Q.* Did you have any others in the State of Michigan?

*A.* Pardon?

*Q.* Did you have any others in the State of Michigan?

*A.* I got picked up for tickets and driver's license and that.

*Q.* No, not traffic. Other than traffic?

*A.* Furnishing to—buying beer for a minor, I got picked up for that. Consuming beer on a public highway.

*Q.* Did you have an assault and battery in September of 1970? A year ago?

*A.* I said I got picked up for assault and battery. I said just before I left for Utah.

*Q.* How about in July, did you have a disorderly person, intoxicated?

*A.* In July for disorderly?

*Q.* Last year, 1970.

*A.* Is that referring to the attempted jail break and that?

*Q.* No, I'm just asking if you were convicted of a disorderly charge at that time?

*A.* No, I was never convicted on disorderly.

*Q.* Were there any other convictions?

*A.* If there was I can't think of them right now.