## PEOPLE v MANNING

Docket No. 81682. Argued January 5, 1989 (Calendar No. 6). Decided
    January 5, 1990. Rehearing denied *post,* 1203.

Robin R. Manning was convicted by a jury in the Saginaw Circuit
    Court, Fred J. Borchard, J., of first-degree murder, possession of
    a firearm during the commission of a felony, and carrying a
    dangerous weapon with unlawful intent. The Court of Appeals,
    WALSH, P.J., and CYNAR and R. L. TAHVONEN, JJ., affirmed in
    an unpublished opinion per curiam (Docket No. 86145). The
    defendant appeals, alleging that the trial court erred in refus-
    ing to grant him a new trial and in admitting into evidence a
    codefendant's midtrial guilty plea.

In an opinion by Justice BOYLE, joined by Chief Justice RILEY
    and Justice GRIFFIN, and an opinion by Justice BRICKLEY, the
    Supreme Court *held:*

The trial court did not abuse its discretion in denying the
    defendant's motion for mistrial at the time of the codefendant's
    midtrial guilty plea, and, in view of its cautionary instruction,
    it did not err in revealing the fact of the plea and the underly-
    ing offense.

1. The grant or denial of a motion for mistrial rests in the
    sound discretion of the trial court. Abuse will be found only
    where denial of the motion deprived the defendant of a fair and
    impartial trial. The risk of guilt by association may be miti-
    gated by a cautionary instruction. While a trial court may
    declare a mistrial where it concludes that even the strongest
    curative instruction would provide insufficient protection for a
    defendant, in this case, because there was no indication on the
    record and no claim that the defendants attempted to exculpate
    themselves at the expense of one another or that the prosecu-
    tion timed plea negotiations to achieve such a result, the
    actions of the trial court did not deprive the defendant of a fair
    trial.

2. Where it is apparent that an accomplice who pleads guilty
    and testifies will be impeached by dealings with the govern-
    ment, there is no unlawful prejudice to the defendant in the
    trial court telling the jury what has occurred, provided the jury
    is properly cautioned regarding the limited use of a plea. A
    complete instruction avoids jury speculation, limits prejudice,

and prepares the jury for resolution of the issue of the credibility of the accomplice's testimony.

Justice BOYLE, joined by Chief Justice RILEY and Justice GRIFFIN, would further hold that where it is clear that the credibility of a witness/accomplice's testimony is to be placed in question, the order in which facts regarding bias are elicited is within the discretion of the trial judge.

The fact and terms of a plea agreement should be permitted to be revealed to the jury during direct examination. The timing of such a revelation should be within the discretion of the trial court. While substantive use against a defendant of evidence of a plea of guilty by a codefendant or accomplice is error, such evidence may be admitted, where appropriately limited for the purposes of impeachment or rehabilitation. Under the common law, a party vouched for the credibility of the witnesses it called. MRE 607(2)(A), while providing that a prosecutor may attack the credibility of a prosecution witness that the prosecutor is obliged to call, unlike its federal counterpart, retains the common-law rule with respect to witnesses the prosecutor is not obliged to call. Whatever validity the voucher rule may have enjoyed, it bears little relationship to the present realities of criminal cases and undermines the law's truth-seeking function. The rule should be modified to recognize trial courts' discretionary authority to permit or to limit elicitation on direct examination of matters concerning a witness' credibility. Where the purpose of reference to a plea agreement is to further the task of evaluating credibility, the agreement is relevant and admissible without reference to the identity of the offering party.

Justice BRICKLEY, concurring in the reasoning and result reached with regard to the issues of the motion for mistrial and the trial court's instruction regarding the codefendant's plea, stated that resolution of the issue of the trial court's authority to permit or limit elicitation of matters concerning a witness' credibility on direct examination should await a more suitable case.

Affirmed.

Justice ARCHER, joined by Justices LEVIN and CAVANAGH, dissenting, stated that the trial court abused its discretion in failing to grant the defendant a new trial and erred in allowing the introduction of the details of the codefendant's guilty plea over the defendant's timely objection. Where the defendant is fully aware of the details of a testifying former codefendant's guilty plea, whether and how the details of that plea are disclosed to the jury remain the prerogative of the defendant.

The prosecution and the trial court should be required to disclose a witness' guilty plea only where nondisclosure would allow a witness' testimony to remain false, where defense counsel does not have specific knowledge of the agreement, or where a defendant attacks the witness' bias because of the plea. The exact nature of the plea need not be disclosed to the trier of fact. Rather, upon the defendant's objection, the jury should be informed only of the existence of a plea and of the nature of any consideration received by the witness in exchange for the plea and testimony, without disclosing the precise crimes of which the witness plead guilty.

Upon the facts of this case, both the midtrial plea of the codefendant and the disclosure of the details of that plea unfairly prejudiced the defendant, and, accordingly, the defendant's conviction should be reversed and the case remanded to the trial court for a new trial.

Justice LEVIN, dissenting, stated that where it appears that a defendant will rely on terms of a plea agreement to impeach the credibility of an accomplice, the terms of the plea agreement should be permitted to be brought out during the direct examination of the accomplice. However, in this case, the recitation of the terms of the plea agreement was incomplete because, while the jury was advised that the accomplice had entered a plea of guilty of second-degree murder that had been accepted by the court, the advice did not reflect all the terms of the plea agreement. Because the jury was not fully informed of what had actually occurred and of its significance, the defendant did not receive a fair trial. Thus, a fair determination of whether the defendant is guilty of first- or second-degree murder or of some lesser or other offense requires that he be retried after his accomplice has been sentenced so that the true consideration for the accomplice's testimony may be revealed, and confusion, misleading, and speculation is avoided.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Christopher S. Boyd,* Prosecuting Attorney, and *Mitzi L. McPeck,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Chari Grove*) for the defendant.

BOYLE, J. In August, 1984, appellant Robin Rick Manning and William John Luna were charged

with first-degree murder, carrying a weapon with unlawful intent, and possession of a firearm during the commission of a felony in connection with the fatal shooting of Thomas Newvine. Newvine's death stemmed from an argument between himself and Gilbert Morales at a neighborhood house party. During the course of the argument, Newvine forcefully ejected Morales from the party, at which time Morales threatened to return later and kill Newvine. After Morales was ejected from the party, he called William Luna's house seeking backup in the fight he intended to continue with Newvine.

Subsequently, the defendant and Luna drove to Morales' home, at which time Morales, armed with two guns, a long-barreled and a shorter-barreled weapon, joined them. When the trio arrived at the party, Newvine was standing in the street immediately outside the home in which the party was being held. Shots were fired from the car and Newvine was killed.

Defendant and William Luna were tried jointly for Newvine's murder.[1]

On the fifth day of trial, William Luna, on the basis of a plea bargain,[2] pleaded guilty of second-degree murder. The defendant rejected a similar bargain against the advice of counsel.

Outside the jury's presence, Manning's counsel then asserted that a new trial was necessary in order to prevent the jury from drawing from Luna's plea an impermissible inference of Manning's

---

[1] Gilbert Morales was charged separately and convicted of first-degree murder and possession of a firearm during commission of a felony.

[2] Luna was charged with first-degree murder, felony-firearm and carrying a dangerous weapon with unlawful intent. In exchange for his plea of second-degree murder, and his testimony, the prosecutor dismissed the remaining charges.

guilt. Defense counsel did not object to the trial court's instruction advising the jury that Luna had pleaded guilty or limiting the substantive use of Luna's plea, but alternatively requested that the trial court inform the jury only that Luna pleaded guilty without specifying the charge to which the plea had been entered. No request was made to limit the prosecution's use of the plea, and no objection was interposed when the prosecution questioned Manning on direct examination regarding the plea.

The trial court denied the motion for a mistrial and informed the jury that Luna pleaded guilty to second-degree murder, cautioning the jury that it was not to draw any inference from Luna's guilty plea and that Manning remained entitled to the presumption of innocence. The instruction was given again prior to deliberation.

Luna testified that Mr. Manning answered the call from Morales asking for backup and that he and Manning drove to Morales' house where Morales brought the guns into the car and said he was going to "blow [the victim] away." He further testified that Manning drove to the party, got out of the car, and took the .22 from the back seat where Morales had placed it. Manning then entered the front passenger side of the car, passed the .22 to Morales, took the shotgun from him, and, with Luna driving, the three continued to look for Newvine. While Luna testified that Manning did not fire the gun he had, other testimony established that guns were fired both from the front passenger and rear windows. Thus, although Luna testified that Morales fired the fatal shots, his testimony inculpated defendant Manning as an aider and abettor of first-degree murder.

Luna was briefly questioned on direct examina-

tion about his plea.[3] On cross-examination, a pointed attack on Luna's credibility was made by defense counsel;[4] following that attack, the prose-

---

[3] Following the trial court's instruction, the prosecution called William Luna as a witness. On direct examination, the prosecution questioned Luna about his plea:

> *Q.* [*Prosecutor*]: Mr. Luna, you were a Defendant in this particular trial before today, were you not?
> *A.* [*Mr. Luna*]: Yes.
> *Q.* And earlier this morning, you pled guilty to second degree murder?
> *A.* Yes.

[4] On redirect examination, the prosecution made further reference to the plea in an effort to bolster the credibility of the codefendant. However, this was only after a pointed attack on Luna's credibility by the defense:

> *Q.* [*Defense Counsel*]: In response to one of the Prosecuting Attorney's questions, you stated or at least agreed with her statement that when you talked to the police, you were trying to, in effect, save your neck. Would that be an accurate statement?
> *A.* Yes.
> *Q.* Were you still trying to save your neck when you entered into a plea bargain agreement?
> *A.* Say that, you know.
> *Q.* Were you still trying to save your neck when you entered into the plea bargain agreement today?
> *A.* Well, all I just want to do is tell the truth like it was because . . .
> *Q.* Why did you suddenly want to tell the truth after you lied so much?
> *A.* Because, you know, that's the way I feel about it, you know.
> *Q.* What happened that suddenly changed your mind that you feel this way?
> *A.* I just didn't want to take it to trial because, you know, I'm guilty—we're guilty, you know.
> *Q.* Mr. Luna, isn't the truth of the matter that you didn't want to take it to trial because you didn't want to risk being found guilty by the jury?
> *A.* No, not that. It's just like I said. I wanted to plead guilty because I am guilty.
> *Q.* You wanted to take the sure thing, didn't you?
> *A.* What's that?
> *Q.* You wanted to take the plea bargain and take the sure thing, didn't you?

cution on redirect examination made further reference to the plea in an effort to bolster Luna's testimony.

The jury found Manning guilty of first-degree murder, carrying a weapon with unlawful intent, and felony-firearm.

After the Court of Appeals affirmed his conviction in an unpublished per curiam opinion, Manning sought leave to appeal in this Court. Leave was granted on two issues: 1) whether the trial court erred by denying the defendant's motion for a mistrial, and 2) whether the trial court erred in denying the defendant's request to keep from the jury the details of the codefendant's guilty plea. For the reasons that follow, we affirm the defendant's conviction.

I

THE MOTION FOR MISTRIAL

The likelihood that Mr. Manning would be acquitted, or convicted of a lesser offense, was greatly diminished when Mr. Luna pleaded guilty and testified against him. However, the grant or denial of a motion for mistrial rests in the trial court's sound discretion, and an abuse will be found only where denial of the motion deprived the defendant of a fair and impartial trial. *People v Watson,* 307 Mich 596; 12 NW2d 476 (1943). Simply put, Mr. Luna's plea was an unfortunate turn of events for the defendant, but it did not

*Mrs. McLeod:* Objection, Your Honor. I think that counsel and I should approach the bench at this point.

(Whereupon a discussion was held off the record.)

*Q.* I'm not certain that you answered the last question, Mr. Luna. My question to you was: Didn't you want to take the plea bargain because you knew what was going to happen?

*A.* No. I took it because, you know, it's the way it is.

constitute unfair prejudice. Luna's testimony was competent, relevant and undeniably admissible, and the trial court's unobjected to cautionary instruction on defendant's right to be tried solely on the evidence of his own guilt appropriately addressed the potential prejudice inherent in the inculpatory nature of accomplice testimony.

That Luna's testimony was highly inculpatory is a proposition no reasonable person would dispute. However, were we to hold that the possibility of guilt by association could not be mitigated by a cautionary instruction, as the dissent suggests, it would logically follow that the only alternative would be to exclude accomplice testimony altogether. In this situation we rely on the "almost invariable assumption of the law that jurors follow their instructions . . . ." *Richardson v Marsh,* 481 US 200, 206; 107 S Ct 1702; 95 L Ed 2d 176 (1987).[5]

We do not suggest that a trial court might not appropriately take the more drastic step of declaring a mistrial where it concludes that even the strongest curative instruction would be insufficient

[5] The dissent fails to articulate the standard by which it determines that the instruction given in this case presents a situation distinct from the myriad of instances where jurors are asked to give effect to evidence for one purpose and not for others. The dissent places heavy reliance on *Bruton v United States,* 391 US 123, 135-136; 88 S Ct 1620; 20 L Ed 2d 476 (1968), where it was held that the admission of a nontestifying codefendant's "powerfully incriminating" statements in violation of the defendant's confrontation right could not be cured by a limiting instruction. Not only were the improperly admitted statements of the nontestifying codefendant "devastating," they were incapable of testing through cross-examination.

The United States Supreme Court has cautioned that *Bruton* creates only a "narrow exception" to the rule that juries are presumed to follow instructions unless there is an "overwhelming probability" that the jury cannot follow the instruction and the result would be devastating to the defendant's case. *Richardson, supra,* p 208. The dissent simply has not explained why the jury in this case should be presumed to have disregarded the instruction that the defendant was to be tried solely on the evidence of his own guilt, without reference to Luna's plea of guilty of second-degree murder.

protection for a defendant. *United States v Baete,*
414 F2d 782 (CA 5, 1969).

We merely hold that on this record, where there
is no indication and no claim that the defendants
attempted to exculpate themselves while destroy-
ing each other or that the prosecution timed the
negotiations to achieve that result, the trial court's
action did not deprive the defendant of a fair trial.

II

### THE COURT'S INSTRUCTION REGARDING THE PLEA

Having determined that William Luna's mid-
trial plea did not compel the declaration of a
mistrial, the trial court was squarely faced with
the issue regarding what to tell the jury about the
absence of the codefendant from the defense table.
The defense did not object to the jury being told
that Luna had pleaded guilty. Rather, counsel
asked only that the jury not be told that Luna's
plea was to the second-degree murder charge be-
cause "it could have some influence on their delib-
erations because of the magnitude of the charge."
Thus, defense counsel did not indicate any intent
to forgo reference to the witness' plea but, rather,
sought to avoid an inference favorable to credibil-
ity from the magnitude of the charge. "[S]uch a
limitation on the details of the plea agreements
would have been both unfair to the witnesses and
misleading to the jury." *United States v White-
head,* 619 F2d 523, 529 (CA 4, 1980).

Suppression of Luna's plea of guilty of second-
degree murder could have confused and misled the
jury.[6] A strategic attempt to prevent the jury's

---

[6] If the issue in this case was whether the defendant was entitled to
have the jury learn all the terms of the plea agreement, Justice
LEVIN's observation that the jury was left to speculate on the extent
of the consideration would be relevant. It is not. Defendant's claim is

knowledge of the charge to which Luna pleaded could logically only rest on the possibility that the defendant could benefit if the jury incorrectly speculated that Luna had somehow wriggled out of accepting criminal responsibility for the events to which he testified and had pleaded guilty of some other lesser or entirely different offense. Indeed, the dissent's identification of the "prejudice" to defendant Manning, on close examination, confirms that inviting such speculation is both the purpose and the function of the request to suppress. Obviously, it was not Luna's plea, but his *testimony* admitting that he aided and abetted the murder that prejudiced Mr. Manning, albeit not in an unlawful sense. Since it was Luna's testimony that incriminated Manning, it cannot logically be concluded that it was the details of the plea that "foreclosed the jury's ability logically to come to any different conclusion regarding Manning," *post,* pp 39-40. Stated otherwise, it is obvious that suppressing the charge to which he pleaded would not eliminate the risk of guilt by association inherent in Luna's testimony but, rather, would only have the effect of preventing the jury from drawing any rehabilitating inference of Luna's credibility from the fact that he had formally accepted criminal responsibility for his actions, a fact defense counsel alluded to in his reference to "the magnitude of the charge."

In sum, where it is apparent that a testifying accomplice will be impeached by his dealings with

___

not that error occurred because of the jury's lack of knowledge; it is that his conviction should be reversed because truthful facts were revealed to the jury. Further, since Luna received the very concession he was promised, a concession which the defendant apparently did not want presented to this jury, presumably for the same reasons he did not want the jury to know the offense to which Luna pled, we are unable to understand how it could be argued that the defendant should have been granted a mistrial so that he would have the opportunity to show this concession at a second trial.

the government, we can perceive no unlawful prejudice to the defendant in the trial court's telling the jury what has occurred, provided the jury is properly cautioned regarding the limited use of the plea. *United States v Earley*, 482 F2d 53 (CA 10, 1973), cert den 414 US 1111 (1973); *United States v Beasley*, 519 F2d 233, 239 (CA 5, 1975); *United States v Jones*, 425 F2d 1048, 1054 (CA 9, 1970).

When a codefendant pleads guilty and is prepared to testify, a complete instruction avoids jury speculation, limits prejudice, and sets the stage for the issue the jury will almost invariably be asked to resolve, that is, the credibility of the accomplice's testimony.

Where it is clear, as it was both from the colloquy with defense counsel and counsel's lack of objection to the prosecutor's elicitation of the plea, that counsel did not intend to forgo use of the plea itself,[7] and a cautionary instruction is given, we can perceive no error in the revelation of the offense pleaded to by a testifying codefendant. As Judge Higginbotham has observed, "[a] trial judge who is cognizant of the risks is not required to ignore his experience in trying such cases and engage in a pretended ignorance that defendant's line of attack is yet unknown. Nor are we." *United States v Fusco*, 748 F2d 996, 999 (CA 5, 1985).

---

[7] The dissent incorrectly assumes that this opinion would preclude introduction of an accomplice/witness' guilty plea "where a defendant chooses not to impeach the credibility of that witness on the basis of *that* plea." *Post*, p 36, n 9, p 44. This case does not present that situation. The answer to that question must await a case in which a defendant claims that the plea was not relevant to the credibility issue and the prosecution claims it was. To be sure, it is the defendant's prerogative to decide *whether* he will pursue impeachment, but it is the trial judge's prerogative to initially determine what facts are relevant to the line of impeachment pursued. Hence, our basic disagreement here is with the dissent's conclusion that counsel may choose to pursue a line of relevant impeachment but prevent exploration of facts undeniably relevant to that issue.

III

THE PROSECUTION'S ELICITATION OF THE PLEA ON
DIRECT EXAMINATION

We are persuaded that the unresolved question of the intersection between the holdings in *People v Atkins,* 397 Mich 163; 243 NW2d 292 (1976), *People v Woods,* 416 Mich 581; 331 NW2d 707 (1982), and *People v Lytal,* 415 Mich 603; 329 NW2d 738 (1982), should be addressed for the benefit of the bench and bar. The two lines of cases represent distinct situations involving convictions of accomplice witnesses. The purpose of *Atkins/Woods* is preventative: to insure that conviction is not based on the prosecution's knowing use of false material evidence. The rule that allows the factfinder to consider evidence of a guilty plea agreement is permissive and is based on the premise that the jury is ordinarily entitled to know of facts relevant to bias and motive for testimony. Because recent holdings may have furthered confusion regarding issues such as whether the prosecution's duty to disclose is conditioned upon a request from defense counsel, or whether a plea can be revealed "when it is the plea itself which is the consideration," *People v Rosengren,* 159 Mich App 492, 502; 407 NW2d 391 (1987), *People v Standifer,* 425 Mich 543; 390 NW2d 632 (1986), an explanation of the etiology of both lines of authority is in order.

The *Atkins/Woods* disclosure requirement was squarely based on *Napue v Illinois,* 360 US 264; 79 S Ct 1173; 3 L Ed 2d 1217 (1959), and *Giglio v United States,* 405 US 150; 92 S Ct 763; 31 L Ed 2d 104 (1972), *Atkins, supra,* p 174, ns 11, 12, and *Woods, supra,* p 601. These cases stand for the proposition that the defendant's right to due process is violated by a conviction based on false

testimony that a witness was not promised consideration for his testimony, a fact, the Court added in *Woods,* that should be introduced in evidence. While it may well be that where the record establishes that defense counsel knew of the agreement and did not bring it out,[8] a claim of error would be viewed as defense strategy on appeal, cf. *Atkins, supra,* pp 171-172 and *Woods, supra,* p 603, the prosecutor's constitutional duty to disclose material evidence to *defense counsel* is not conditional on the defendant's request. *United States v Agurs,* 427 US 97; 96 S Ct 2392; 49 L Ed 2d 342 (1976).

To illustrate the distinction between the holdings, we assume a situation in which there is no attack on the accomplice witness. In such a situation, we do not believe *Woods* is the source of an affirmative right in the prosecution. In short, we do not regard the *Atkins/Woods* rule as giving the prosecutor a right to override a strategic decision by defense counsel to forgo attack on an accomplice and to authorize the prosecution to disclose such consideration *to the jury* irrespective of a request.[9] In contrast, in the typical case the accomplice's credibility is put in issue and consideration bears on that issue. In such a case, we would hold that the fact and terms of the plea agreement may be revealed to the jury during direct examination, and the timing of the revelation is within the trial court's discretion.

The origin of *Lytal* is the longstanding principle that a defendant is entitled to have the question of

---

[8] Quære: Would defense counsel's waiver of the jury's knowledge of such facts constitute ineffective assistance of counsel?

[9] Where defense counsel eschews impeachment of the accomplice and the purpose of disclosure is solely to protect the defendant's right not to be convicted on false testimony, the canons suggest that the prosecutor's duty to disclose may be satisfied by bringing the agreement to the attention of counsel and the court. ABA Model Rule of Professional Conduct, Rule 3.8(d); Michigan Rules of Professional Conduct, Rule 3.8(d).

his guilt determined solely on the evidence against him. *People v Crawl*, 401 Mich 1, 33; 257 NW2d 86 (1977) (LEVIN, J.). As Justice LEVIN recognized in *Crawl*, a prosecutor is entitled on redirect examination to attempt to rebut the implication that an accomplice is testifying "in the hope of obtaining leniency . . . with evidence showing the nature of the concessions made to him." *Id.*, p 34.

The well-established rule that a plea of a co-defendant or an accomplice is not evidence of a defendant's guilt is only the starting point for discussion. It is equally well recognized that it is the purpose for which evidence is admitted that governs its proper use. Thus, while a host of cases hold that substantive use of the guilty plea of a codefendant is error, see, e.g., *United States v Solomon*, 795 F2d 747 (CA 9, 1987); *United States v Baez*, 703 F2d 453 (CA 10, 1983); *United States v Duff*, 707 F2d 1315 (CA 8, 1983), the guilty plea of an accomplice is admissible for impeachment or rehabilitation, where its use is appropriately limited. So much was recognized in *Crawl* and is otherwise well established. See *United States v Rothman*, 463 F2d 488 (CA 2, 1972); *United States v Baete, supra*, p 782; *United States v Romeros*, 600 F2d 1104 (CA 5, 1979); *Baker v United States*, 393 F2d 604 (CA 9, 1968).

*Lytal* addressed a situation in which the prosecutor on direct examination elicited the fact of the plea agreement, including the charge to which the accomplices pleaded. Although not mentioned in the text of the opinion, a complete analysis of the admissibility on direct examination of a plea of guilty that is the "consideration," *id.*, p 612, also requires consideration of the effect of MRE 607(2) (A). The rule is entitled "Who May Impeach" and in relevant part provides:

The credibility of a witness may be attacked by

\* \* \*

(2) the calling party if

(A) the calling party is the prosecutor and he is obliged to call the witness.

By contrast, FRE 607 provides:

The credibility of a witness may be attacked by any party, including the party calling the witness.

Thus, the federal rules reject the common-law rule that a party vouches for the credibility of the witnesses it calls, while MRE 607(2)(A) retains the rule for witnesses the prosecution is not "obliged to call."

Professors Weinstein and Berger observe that the only surprising aspect of the abandonment in the federal rules of the voucher rule is "that it has taken so long to be effected." 3 Weinstein & Berger, Evidence, § 607[01], p 607-15. The common-law rule is based on an assumption that a party exercises free choice in soliciting witnesses and therefore guarantees the trustworthiness of a witness called by him. In fact, as the United States Supreme Court noted in *Chambers v Mississippi,* 410 US 284, 296; 93 S Ct 1038; 35 L Ed 2d 297 (1973):

Whatever validity the "voucher" rule may have once enjoyed, and apart from whatever usefulness it retains today in the civil trial process, it bears little present relationship to the realities of the criminal process. It might have been logical for the early common law to require a party to vouch for the credibility of witnesses he brought before the jury to affirm his veracity. Having selected them especially for that purpose, the party might reasonably be expected to stand firmly behind their testimony. But in modern criminal trials, defen-

dants are rarely able to select their witnesses: they must take them where they find them.

The common-law rule also undermines the law's truth-seeking function, a principle endorsed by this Court in Rule 401 of the Michigan Rules of Evidence. As Weinstein and Berger further observe, the result of such a rule is to leave the calling party and the factfinder at the mercy of the adversary. If the truth lies on the side of the calling party and the witness tells the truth, he can be attacked by the adversary; if he tells a lie, he will not be attacked, and the calling party under the rule cannot attack unless it can show hostility and surprise. *People v White,* 401 Mich 482, 508-509; 257 NW2d 912 (1977).

We are unable to reconstruct the reason for retention of the common-law voucher rule in MRE 607(2)(A). The Court's rejection of the federal approach to prior inconsistent statements, compare FRE 801 and MRE 801, may evidence that a primary concern was the more troublesome problem of the potential for admission of unreliable evidence in the guise of impeaching one's own witness.[10] See Weinstein & Berger, *supra,* pp 607-16 and 607-18. This was the issue that divided this Court as long ago as its decision in *People v Elco,* 131 Mich 519; 91 NW 755 (1902), where on rehearing, p 523, the Court held that the prosecution could impeach witnesses it was obliged by law to call. While the precise holding was limited to hostile "res gestae" witnesses, p 528, the Court's discussion in *Elco* presaged by fifty years the United States Supreme Court's observations concerning the voucher rule.[11] The Court in *Elco* stated:

---

[10] A plea concession given to a counseled defendant, which is typically of record, does not present the same concerns.

[11] *Chambers v Mississippi, supra,* p 296.

Whatever force [the voucher rule] may have in civil cases, it has no force in criminal ones, under the decisions of this court. In numerous decisions this court has held that the prosecuting attorney is bound to produce before the jury facts which tend to prove, not only guilt, but those which tend to prove innocence. . . . [M]any of the witnesses in criminal cases do not come from the ranks of those entitled to the presumption of truth-tellers. They are often the accomplices of criminals and participants in crime, who have confessed and promised to testify to escape punishment. . . . Witnesses are not manufactured by the prosecution to order. It must take them as it finds them. [*Id.,* pp 525-526.]

We need not consider an amendment of MRE 607 to resolve the tension between this Court's preference for the admission of all relevant evidence, MRE 401, that is not more prejudicial than probative, MRE 403, and the anachronistic consequences of applying the voucher rule to bar revealing during direct examination the fact and terms of a plea concession given to an accomplice.[12]

In the typical case the argument regarding admissibility of a plea agreement is one of timing, that is, whether the prosecutor may draw the sting from the defendant's anticipated cross-examination by eliciting the agreement on direct examination or whether the defendant has a right to draw first blood. *Lytal* converted the rule that a codefendant's plea of guilty cannot be used as substantive evidence of another's guilt into a rule requiring reversal on the basis of an anticipatory rehabilitation of an accomplice impeached by a prosecution

---

[12] The current statute, 1986 PA 46, MCL 767.40a; MSA 28.980(1) provides:

(6) *Any party may within the discretion of the court impeach or cross-examine any* witnesses as though *the witness* had been called by *another party.*

concession. Such arguments exalt strategy over substance. In the typical case, the existence of an agreement is "a double-edged sword," and prejudice is rarely, if ever, to be found on review because the record reveals that each side has attempted to have its side cut more deeply. *United States v Arroyo-Angulo,* 580 F2d 1137, 1146 (CA 2, 1978), and *People v Benton,* 402 Mich 47; 260 NW2d 77 (1977).

Although one option may be for the judge to call the witness for the purpose of placing the terms of the agreement in evidence, which is an exception to the voucher rule that the federal system had developed to cushion the effect of the nonimpeachment rule years before FRE 607 eliminated the voucher rule, *United States v Browne,* 313 F2d 197, 199 (CA 2, 1963); anno: *Court's witnesses (other than expert) in criminal prosecution,* 67 ALR2d 538, we would not create a hard-and-fast rule that this is the only acceptable practice. Such an approach might only seed new ground for disputes regarding perceived strategic advantages at trial and claims of error on appeal.

We would hold, therefore, that the trial court's authority to control the order of proofs, MRE 611, and the completeness rule set forth in MRE 106, vest the trial court with appropriate discretion to determine when the fact and terms of an accomplice's plea agreement may be admitted. As with other preliminary matters, the trial court should assure itself that a witness' credibility will be put in question.[13] Where it has done so, the court may either permit the prosecution to anticipate cross-examination by eliciting the terms of the agree-

---

[13] If the defendant makes a timely objection to elicitation of the plea agreement, the inevitability of impeachment may become apparent. It would then fall to the defendant to disclaim any intent to impeach and on the trial judge to either sustain the objection or permit the questioning.

ment on direct examination or direct that the terms and conditions of the agreement may be brought out first by defense counsel. The first approach is justified on the theory that in the case of a plea agreement, the prosecutor's failure to allude to the facts may confuse or mislead the jury. As Judge Posner described it:

> A party ought to be able to extract the complete testimony of his witness, including the essential circumstances bearing on its believability, rather than forced to leave gaping holes to be poked at by his opponent. This is particularly true in the matter of a plea or immunity agreement, since the jury is bound to wonder from the outset why someone should be testifying to all these things that damn him along with the defendant, and having wondered may be shocked or puzzled to discover the reason for the first time on cross-examination. . . . It is on this theory that defense counsel, in beginning their examination of a defendant, will often ask him about his criminal record, knowing that if they do not ask, the prosecutor will do so on cross-examination. [*United States v LeFevour*, 798 F2d 977, 983-984 (CA 7, 1986).]

The second approach is justified both because in a given case a prediction (that the witness will be attacked) "may be inaccurate" and anticipated impeachment "has a tendency to become [a] self-fulfilling prophecy," *United States v Fusco, supra,* pp 998-999 (opinion of Higginbotham, J.), and because of the trial judge's superior position in evaluating the shifting existential realities of the trial process. As Professors Weinstein and Berger state in the preface of their work, there is

> the need for flexibility and discretion in the court's conduct of particular cases and particularly in its application of the rules of evidence. . . . [T]he

subtle interplay of a wide variety of factors . . .
make a trial of any length take on a personality as
strongly differentiated from other trials as one
human being is from another. . . . These litigation
psychodynamics, but dimly if at all perceived from
the record, are nevertheless critical in trial super-
vision. In dealing with them, the oral tradition of
the bar and a sense for what is proper, often
furnish the best guides. [1 Weinstein & Berger,
Evidence, p iv.]

In sum, we would modify the voucher rule in
favor of the trial court's discretionary authority to
permit or to limit the elicitation of matters con-
cerning a witness' credibility on direct examina-
tion. When the purpose of reference to a plea
agreement is to further the task of evaluating
credibility, the agreement is relevant and admissi-
ble without reference to the identity of the offering
party. *United States v Halbert,* 640 F2d 1000 (CA
9, 1981).[14] The record establishes the defendant's
intention not to forgo use of the guilty plea, his
affirmative employment of it, and a cautionary
instruction regarding the limited use of the evi-
dence. We would hold that the fact that the agree-
ment was revealed during direct examination of
the accomplice does not constitute prejudicial er-
ror.

### CONCLUSION

The trial court did not abuse its discretion in

---

[14] The United States Courts of Appeals for the First, Second,
Fourth, Fifth, Sixth, Seventh, and Ninth Circuits permit elicitation of
the agreement on direct examination to assess credibility. *United
States v Winter,* 663 F2d 1120 (CA 1, 1981); *United States v Freeman,*
302 F2d 347 (CA 2, 1962); *United States v Henderson,* 717 F2d 135
(CA 4, 1983); *United States v Veltre,* 591 F2d 347 (CA 5, 1979); *United
States v Townsend,* 796 F2d 158 (CA 6, 1986); *United States v
Hedman,* 630 F2d 1184 (CA 7, 1980); *United States v Roberts,* 618 F2d
530 (CA 9, 1980). The court observes in *Halbert,* p 1005, that the plea
agreement may be misused "on the level of prejudicial error" in
certain circumstances such as where the plea is clearly offered as
substantive evidence of guilt.

denying the motion for mistrial and, in view of the cautionary instruction, did not err in revealing the fact of the plea and the offense to which the plea had been given. Where it is clear that the credibility of a witness/accomplice's testimony will be put in question, the order in which facts regarding bias are elicited is within the discretion of the trial judge.

The decision of the Court of Appeals is affirmed.

RILEY, C.J., and GRIFFIN, J., concurred with BOYLE, J.

BRICKLEY, J. I concur in the result reached by Justice BOYLE. Additionally, I am in agreement with the reasoning of parts I and II. Because of the complexity of the *Atkins-Lytal-Standifer* conflict, I would await a case that is more factually suitable to its resolution. Accordingly, I do not join in the analysis and conclusion reached in part III of Justice BOYLE's opinion. Defendant's conviction is affirmed.

ARCHER, J. (*dissenting*). Defendant Robin Rick Manning was convicted by a jury of first-degree murder, MCL 750.316; MSA 28.548. Saginaw Circuit Court Judge Fred J. Borchard sentenced defendant to a mandatory life sentence. The Court of Appeals affirmed defendant's conviction and sentence. We granted leave to appeal limited to the issue whether the trial court erred in denying the defendant's motion for mistrial and his request to keep from the jury the details of his codefendant's midtrial guilty plea.

I would hold that the trial court abused its discretion in its failure to grant the defendant a new trial and erred by allowing the introduction of

the details of Manning's codefendant's guilty plea over Manning's timely objection. I therefore respectfully dissent.

FACTUAL AND PROCEDURAL BACKGROUND

In August, 1984, defendant Manning and William John Luna each were charged with first-degree murder, carrying a weapon with unlawful intent and possession of a firearm during the commission of a felony in the fatal shooting of Thomas Newvine. Newvine's death stemmed from an argument between himself and one Gilbert Morales at a neighborhood house party. During the course of the argument, Newvine forcefully ejected Morales from the party, at which time Morales threatened to return later and kill Newvine. After Morales was ejected from the party, he called William Luna seeking backup in the fight he intended to continue with Newvine. At the time Morales called Luna, the defendant was also present and agreed to assist when Morales returned to the house party.

Subsequently, the defendant and Luna apparently met Morales at his home, at which time Morales joined them in the defendant's car, armed with two long-barreled guns. There is conflicting testimony as to whether the defendant was aware that Morales was in possession of the weapons at the time he entered the defendant's car.[1] When the trio arrived at the party, Newvine was standing in the street immediately outside the home in which the party was being held. Morales shot at Newvine repeatedly, killing him.

---

[1] Although Luna asserted that Morales left his home with the weapons in full view and placed them in the defendant's car with the defendant's knowledge, the defendant testified that he was not aware that Morales was armed until they arrived at the party, at which time he unsuccessfully attempted to disarm Morales and prevent the shooting.

Defendant and William Luna were scheduled to be tried jointly for Newvine's murder. The trial court denied three separate motions for severance that Luna made and Manning joined.

For four consecutive days, Manning and Luna were codefendants in a joint trial. On the fifth day, William Luna accepted a plea bargain and pleaded guilty of second-degree murder. The defendant rejected a similar bargain against the advice of counsel.

Outside the jury's presence, Manning's counsel then asserted that a new trial was necessary in order to prevent the jury from drawing from Luna's plea an impermissible inference of Manning's guilt. In the alternative, counsel requested that the trial court inform the jury only that Luna had pled guilty of an unspecified charge.

The trial court denied the motion for a mistrial and informed the jury that Luna had pled guilty of second-degree murder, cautioning the jury that it was not to draw any inference from Luna's guilty plea and that Manning remained entitled to the presumption of innocence.

Five days after Luna and Manning's attorneys delivered opening arguments indicating to the jury that the facts would show that Luna and Manning were both passive observers to Morales' crimes, Luna was called as a witness against the defendant. Essentially, Luna told the jury that the defense theory his counsel had briefly outlined for the jury—a defense virtually identical to that told by Manning's attorney—was a lie. Although Luna stated it was Morales who fired the fatal shots, he told the jury that Manning played an active role in the shooting. Luna's testimony contradicted Luna's and Manning's earlier statements to the police and Manning's testimony regarding the kill-

ing. The testimony directly contradicted the defenses outlined by both defense attorneys.

Luna maintained both on direct and cross-examination that his testimony was not given in order to avoid a conviction of first-degree murder. Rather, he asserted that his plea was given without consideration and was merely an attempt to clear his conscience and state the events as they actually occurred.[2]

The jury found Manning guilty of first-degree murder, carrying a weapon with unlawful intent, and felony-firearm.

After the Court of Appeals affirmed his conviction in an unpublished per curiam opinion, Manning sought leave to appeal in this Court. We granted leave limited to the issues of the trial court's refusal to grant the defendant a new trial and the propriety of its introduction of the details of William Luna's guilty plea. 430 Mich 890 (1988).

I

The trial court committed error requiring reversal in its refusal to grant a mistrial subsequent to the entry of William Luna's guilty plea.[3] While I am cognizant of the great amount of deference afforded a trial court's decision on a motion for a new trial, my examination of the facts in this case leads me to the conclusion that the trial court abused its discretion when it denied Manning's motion, because Manning's substantial rights to a fair trial and to a presumption of innocence were unjustly prejudiced.

[2] Luna was eventually sentenced to a term of ten to twenty years for the second-degree murder conviction.

[3] The trial court's decision may be reversed upon a showing of abuse of discretion. *People v Hampton,* 407 Mich 354, 375; 285 NW2d 284 (1979); MCL 770.1; MSA 28.1098.

A

It was impossible for Manning to receive a fair trial when his codefendant, who for four days of trial had pursued a nearly identical defense, admitted committing murder and took the stand for the prosecution.

The opening arguments and cross-examinations of defense counsel indicate that Luna and Manning pursued complementary defenses which placed each at the murder scene, yet depicted Morales as the key actor. However, upon Luna's entry of the guilty plea, Luna's story and role changed dramatically. While he was formerly Manning's companion at the defense table, he became Manning's accuser from the witness stand.[4]

> [*Prosecutor* (on direct examination)]:
> *Q.* Who drove to the party?
> *A.* Manning.
>
>     \*   \*   \*
>
> *Q.* What happened then?
> *A.* And then, well, Manning got out the car, was talking to somebody, too. And then he opened the back seat of the back, in back, and then he got, uh, the .22 out. And then he went around and went to the passenger's side where I was.
> *Q.* All right. When you say around, did he go around the car in the front or around the car in the back?
> *A.* The back.
> *Q.* So Manning, who was in the driver's seat, got out, got a .22 out of the back seat?
> *A.* Yeah.

---

[4] At the time Luna testified, he had not yet been sentenced. Accordingly, one can safely assume that Luna's testimony was delivered under an expectation of leniency. The fact that Luna eventually received a term of only ten to twenty years as compared to the defendant's sentence of mandatory life without parole supports this assumption.

*Q.* And walked around the back of the car and got in which passenger's seat?

*A.* The front. In the passenger's seat.

*Q.* The front? What did you do since you had already been at that seat?

*A.* Well, I just scooted to the driver's seat.

*Q.* Did anybody tell you to do that?

*A.* Yeah. Manning told me, "Scoot over," you know. Gilbert said, "Go ahead, drive."

*Q.* Go ahead, what?

*A.* Drive.

*Q.* Drive?

*A.* Yes.

*Q.* Did Manning tell you to drive, too?

*A.* Yes.

*Q.* What happened then?

*A.* Well, then I scooted over and Manning got in the car with that rifle and then Gilbert handed him a shot gun, and then Manning passed him back the .22. And then Gilbert said, "You ready?" He said, "Yeah." So, you know, we were driving. I was driving slow and I ducked, you know, ducked down.

* * *

[Direct examination continued]:

*Q.* Mr. Luna, at the time of your arrest, did you have the occasion to speak with Detective Genovese?

*A.* Yes.

*Q.* And did Detective Genovese read you your rights and you waived them and decided that you would give a statement?

*A.* Yes.

*Q.* In that particular statement, you said some things but didn't say everything that you told the Court and the jury today?

*A.* Yes.

*Q.* What happened between then and now? I mean, why didn't you tell Detective Genovese at the statement everything you're telling us now?

*A.* Well, I was scared to tell them because, you

know, I didn't want to get, get involved with this stuff. But that's why I'm here, to tell the truth, you know, because . . .

Q. Is it fair to say, Mr. Luna, you were trying to save your neck at the time that you were talking to Detective Genovese?

A. Yeah. Yes.

Q. So you were going to put yourself in the car driving?

A. Yes.

\* \* \*

[On cross-examination]:

Q. You told [Detective Genovese] that the guns weren't put in the car.

A. Yes. I told him that.

Q. When Detective Genovese asked you whether the car ever stopped and people got out and changed places, how did you tell him? Did you tell him yes or no?

A. What's that?

Q. When Detective Genovese asked you whether or not the car had ever stopped and people had changed places, did you tell him that it happened or it hadn't happened?

A. I told him that it didn't happen.

Q. Did you tell the Detective that you didn't know that he had a gun?

A. Did I tell him?

Q. That you didn't know that Gilbert Morales had a gun.

A. Oh, yeah. That was . . .

\* \* \*

Q. And you did tell him that the guns were not brought to the car by Gilbert Morales, didn't you?

A. That's when, uh, right. You know, that statement right there, that's when I was talking to him but, see, you know, I'm making everything clear so you know. Right there is where I lied on the statement. That's why I'm . . .

\* \* \*

*Q.* Why did you suddenly want to tell the truth after you lied so much?

*A.* Because, you know, that's the way I feel about it, you know.

*Q.* What happened that suddenly changed your mind that you feel this way?

*A.* I just didn't want to take it to trial because, you know, *I'm guilty—we're guilty, you know.*

*Q.* Mr. Luna, isn't the truth of the matter that you didn't want to take it to trial because you didn't want to risk being found guilty by the jury?

*A.* No, not that. It's just like I said. I wanted to plead guilty because I am guilty.

*Q.* You wanted to take the sure thing, didn't you?

*A.* What's that?

*Q.* You wanted to take the plea bargain and take the sure thing, didn't you?

*Mrs. McLeod:* Objection, Your Honor. I think that counsel and I should approach the bench at this point.

(Whereupon a discussion was held off the record.)

*Q.* I'm not certain that you answered the last question, Mr. Luna. My question to you was: Didn't you want to take the plea bargain because you knew what was going to happen?

*A.* No. I took it because, you know, it's the way it is.

On recross-examination:

*Q.* Mr. Luna, you just told the Prosecutor from your statement that you told the Detective you weren't sure when the guns were put in the car; is that correct?

*A.* Yes. But now I'm telling the truth right now.

*Q.* All right. Now, from your statement, the question and answer directly underneath the ones you just responded to for the Prosecuting Attorney, those two, the third question from the bottom,

after saying you're not sure when the guns were put in the car, didn't you turn around and then tell Detective Genovese you never saw a gun until he was shot?

*A.* Let me read this first.

*Q.* Please do.

*A.* What's that now?

*Q.* When the Prosecuting Attorney just asked you the question from what you told Detective Genovese, you told them you weren't sure when the guns were put in the car; is that correct?

*A.* That's when I was lying.

*Q.* I see. Now, the question and answer from your statement which is directly underneath the questions you responded to, you told Detective Genovese you never seen [sic] a gun until Gilbert shot; isn't that correct?

*A.* Yes. But that's when I was lying.

*Q.* Okay. Now, that means you told either the police or us here in Court three different things. You've said no, the guns weren't put into the car, then you said maybe they were, and now today you say yes, they were. Those are three different answers, aren't they?

*A.* Uh-hum.

*Q.* They're conflicting answers, aren't they?

*A.* What you mean by that?

*Q.* They don't agree with each other, do they?

*A.* Well, the one I told here was the one I meant. It was true.

*Q.* Oh, I see. So the others aren't true?

*A.* Yes. [Emphasis added.]

Luna specifically recanted the story of innocence he originally told the police and the defense theory both his and Manning's attorney had been building. Luna thereby communicated to the jury that Manning was a liar when he pleaded "not guilty" and demanded a jury of his peers. Luna sat at the defense table for four days, and the fifth day he sat before the jury and told them that in present-

ing his defense, "I was lying . . . I'm guilty—we're guilty . . . ." This communication deprived Manning of a fair trial.

### B

It is well-settled that Manning had no absolute right to a separate trial. The Code of Criminal Procedure, MCL 768.5; MSA 28.1028, gives the trial court the discretion to decide whether co-defendants may be tried separately or jointly. A court abuses that discretion, however, when it fails to grant a new or separate trial to a defendant whose substantial rights might be prejudiced by the continuation of a joint trial. See *People v Schram,* 378 Mich 145; 142 NW2d 662 (1966); *People v Hurst,* 396 Mich 1; 238 NW2d 6 (1976); *People v Duplissey,* 380 Mich 100; 155 NW2d 850 (1968).[5]

In his opinion for the Court in *Hurst, supra* at 4, Justice LEVIN stated, "[a] defendant is entitled to a trial separate and apart from a codefendant who it appears may testify to exculpate himself and incriminate the defendant seeking a separate trial." Here, it not only appeared that Luna might testify to exculpate himself and incriminate Manning, he did precisely that. Before Luna's plea, both defendants advanced the theory that neither knew Morales possessed weapons. How-

[5] Although I rely on *Hurst* as setting the standard for determining when a codefendant's right to a fair trial has been compromised, I want to underscore the difference between the standard announced in *Hurst* for determining at the outset of a trial when separate trials are appropriate, and the standards applicable here, when *midtrial* it becomes apparent that a new trial is necessary to protect the rights of codefendants. While the standards for granting a mistrial and granting a severance are similar, there exists one fundamental distinction between the two: a motion for severance is based on a prediction regarding antagonistic defenses, while a motion for mistrial is based on an actual event at the trial which put the defendant's substantial rights at risk.

ever, while testifying at trial, prior to his sentencing hearing, Luna told the jury (and the judge) that Manning handled weapons while Luna merely drove Manning's car. Luna's impetus to assist the prosecution in convicting Manning is clear. It is precisely this codefendant-as-prosecutor scenario that the rule in *Hurst* is meant to prevent. The lead opinion misreads the record when it states there is "no claim that the defendants attempted to exculpate themselves while destroying each other . . . ." *Ante,* p 9.

Likewise, the lead opinion misconceives rules articulated by this Court in *Duplissey* and *Schram* when it suggests that the standard for granting a mistrial depends on a *Hurst* analysis or a finding that "the prosecution timed the negotiations to achieve [a codefendant as prosecutor] result . . . ." *Ante,* p 9. The analysis here requires inquiry into prejudicial effect, not prosecutorial intent. In *People v Duplissey, supra,* a unanimous bench of this Court agreed that defendant Duplissey was unfairly prejudiced by the continuation of a joint trial where his codefendants were engaged in behavior so rude and disruptive that the trial court ordered them bound and gagged. The Court reversed Duplissey's conviction because of the risk that the jury based its verdict on the actions of his codefendants. The Court never inquired into prosecutorial intent:

> [F]rom a fair reading of the record, we can only conclude that appellant was so prejudiced by trial with the codefendants, whose conduct has been herein described, as to render the denial of his motion timely made for a separate trial an abuse of judicial discretion. [380 Mich 104.]

Manning was similarly prejudiced in the eyes of the jury when his codefendant changed his plea midtrial and testified to the same jury he had just

been asking to acquit him. He should be allowed a new trial untainted by the risk that the jury will convict because his codefendant changed his story before the jury's eyes.

While it is true that at a new trial Luna may once again take the stand to testify against his former codefendant, at a new trial he would do so before a new jury, a jury that did not hear Luna's and Manning's two attorneys make similar claims before Luna renounced these claims as "lies." The jury most certainly made a logical inference when Luna left the defense table and admitted that his plea of not guilty was disingenuous: the jury would naturally—and impermissibly—infer that Manning's plea and his attorney's argument were likewise obfuscations of the truth. Such an inference took from Manning a fundamental right guaranteed to all accused—the right to be presumed innocent.

The implication the jury would naturally draw from Luna's midtrial change of plea is also impermissible because it promotes an inference of guilt by association. Every criminal defendant has the right to have guilt or innocence determined on the basis of the defendant's own actions and intent, not on the grounds of a codefendant's admissions. *People v Eldridge,* 17 Mich App 306; 169 NW2d 497 (1969); *People v Brocato,* 17 Mich App 277; 169 NW2d 483 (1969). Justice COOLEY, writing for a unanimous Court in *People v Stevens,* 47 Mich 411, 413; 11 NW 220 (1882), held that a judge committed "grave" error in instructing a jury incorrectly regarding the effect of a codefendant's admissions on the guilt of the accused:

> [The codefendant] could admit the crime for himself, but he could make no admissions for [the defendant], even though they might relate to his own conduct.

This Court reiterated that principle eighty-five years later in *People v Liggett,* 378 Mich 706, 714; 148 NW2d 784 (1967):

> Whenever defendants are jointly tried, it is of utmost importance that the rights of each defendant be carefully protected by the trial judge. No defendant should be convicted of the crime of another defendant.

When one codefendant changes his plea, the jury's natural, human reaction will be to convict one on the admission of the other. Such a conviction should be reversed because it is based on a premise forbidden by the law. To determine guilt, a jury must find beyond a reasonable doubt that a defendant's actions and intent were those proscribed by a criminal statute. A verdict based on any less a finding is incurably flawed. Thus, where a jury is allowed to find "if one codefendant is admittedly a murderer, the other codefendant must also be a murderer," the verdict must be reversed.[6]

An instruction from the bench is simply insufficient to overcome the prejudice in this situation. I agree with the reasoning propounded by the United States Supreme Court in *Bruton v United States,* 391 US 123, 135-136; 88 S Ct 1620; 20 L Ed 2d 476 (1968):

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is

---

[6] Justice Scalia wrote for the majority in *Cruz v New York,* 481 US 186, 193; 107 S Ct 1714; 95 L Ed 2d 162 (1987), and held that the factors "deemed relevant in this area [are]: the likelihood that the instruction will be disregarded . . . the probability that such disregard will have a devastating effect . . . and the determinability of these facts in advance of trial . . . ." *Cruz* is a companion case to *Richardson,* relied upon by the lead opinion, though it conspicuously fails to mention its holding.

so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. [Citations omitted.][7]

A majority of this Court explicitly adopted this language from *Bruton* in *People v Allen,* 429 Mich 558; 420 NW2d 499 (1988). Writing for the Court, Justice BRICKLEY held that in some situations, a cautionary instruction is simply inadequate to prevent the jury from drawing impermissible inferences from evidence of a testifying witness' prior convictions. *Allen* at 572-574.

Therefore, because the record shows Manning's conviction of first-degree murder to rely so heavily on Luna's testimony as the only available eyewitness account regarding Manning's direct involvement in the shooting, I would reverse the judgments of the trial court and the Court of Appeals and grant Manning a new trial.

II

Consistent with our grant of leave to appeal, there remains the question of the propriety of the trial court's introduction of the details of Luna's guilty plea. The claim of error before the Court is not whether the trial court erred in informing the

---

[7] See also *Cruz,* n 6 *supra.*

jury that Luna pled guilty, or whether the trial court erred in allowing the prosecution to elicit details of Luna's plea on direct examination once the court had already informed the jury of the details of the plea. Rather, the issue is whether the court erred when it informed the jury that Luna pled guilty of murder.[8]

This case raises the difficult question when otherwise relevant evidence should be excluded on timely motion by a defendant because its prejudicial effect would subvert the trial's truth-seeking process.

Because I recognize the danger that a jury might unfairly and impermissibly infer a defendant's guilt from the guilty plea of a codefendant, I would hold that evidence of the details of a codefendant's guilty plea of the crime with which the defendant is charged may be admitted into evidence so long as the defendant does not timely object. Such evidence is, however, admissible only where the defendant seeks to attack the testifying codefendant's credibility on the basis of the deal he has made with the prosecution. Such a rule would not disturb the prosecutor's duty imposed by *People v Standifer,* 425 Mich 543; 390 NW2d 632 (1986), *People v Woods,* 416 Mich 581; 331 NW2d 707 (1982), and the professional rules of ethics to disclose to the court and defendant's counsel any leniency or promises of favorable

---

[8] The lead opinion correctly points out that Manning's counsel did not object to the prosecution's eliciting testimony on direct examination of Luna regarding the details of the guilty plea. There was, however, *no reason for an objection* once the judge informed the jury of the terms of the plea. Therefore, there is no reason for this Court to construe, let alone effectively abolish, the protections of MRE 607(2)(A). That rule is important in my analysis only to show that, had the trial court followed the teachings of *Lytal* and refrained from informing the jury that Luna admitted to "murder," an appropriate ruling on a timely objection on MRE 607 grounds would have insured Manning's ability to keep the details of the plea out of evidence.

treatment granted a witness in exchange for testimony, where the defendant is unaware of the terms of the agreement or where such disclosure is necessary to prevent or oppose perjurious testimony.

While I agree with the thrust of the rule offered by the lead opinion in its "clarification" of the *Woods/Atkins/Lytal* cases,[9] I disagree for three reasons. First, it holds that the admission of the details of Luna's guilty plea did not unfairly prejudice Manning. Second, it amends MRE 607(2)(A) to allow the court or the prosecution to bring in evidence regarding the substantive offense to which a codefendant has pled upon the trial court's conjecture regarding what the defendant's theory of cross-examination will be. Third, it allows prejudicial introduction of evidence of the details of the codefendant's plea whenever that codefendant's credibility is attacked, instead of carefully limiting that exception to situations where the witness' credibility is attacked *on the basis of a deal with the prosecution.*

A

While I agree that introduction of the details of a codefendant's guilty plea will prevent jury speculation and better enable a jury to evaluate a witness' credibility, I strongly disagree that it necessarily "limits prejudice." *Ante,* p 11. The lead opinion fears the exclusion of undeniably relevant evidence regarding the terms of a codefendant's plea "may confuse or mislead the jury." *Ante,* p 19. I believe, however, that in instances such as that presented in this case, the danger of a jury

---

[9] I agree with the lead opinion insofar as it adopts a rule that can be construed as prohibiting introduction of an accomplice/witness' guilty plea where a defendant chooses not to impeach the credibility of that witness on the basis of that plea.

unfairly convicting a defendant on the basis of a codefendant's admitted guilt are so great that the truth-seeking process can only be served by withholding from the jury any details regarding the crime to which a codefendant pled, the opinions of Judge Posner notwithstanding.

Our rules of evidence have long recognized that some logically relevant[10] evidence must be kept from the jury if its introduction might lead to impermissible inferences. As currently written and interpreted, MRE 402 recognizes that not all *logically* relevant material is *legally* relevant. Indeed, many evidentiary rules *exclude* "relevant" evidence, either because its admission would contravene some important policy,[11] because it is not sufficiently trustworthy, or because its admission would tend to mislead or prejudice the jury, causing it to short circuit its important deliberative processes. It has been said that a major purpose of the Rules of Evidence is to control the type, character, and quality of the information which reaches the jury in order that, as a society and as legal practitioners, we can put faith in the verdicts of juries—so that we can comfortably call them "the truth."[12]

MRE 403 provides that relevant evidence may be withheld from a jury when "its probative value is substantially outweighed by the danger of unfair

---

[10] MRE 401 defines "relevant evidence" as

evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

[11] See, e.g., MRE 407 (evidence of subsequent repair); MRE 408 (evidence of compromise and offers to compromise); MRE 409 (payment of medical and similar expenses); MRE 501 (privilege).

[12] See Nesson, *The evidence or the event? On judicial proof and the acceptability of verdicts,* 98 Harv L R 1357 (1985).

prejudice, confusion of the issues, or misleading the jury . . . ." That rule has been consistently applied by this Court in cases where we have held trial courts in error for allowing relevant but overly prejudicial evidence to be presented to the jury. For example, this Court has recognized that

> [e]vidence of other crimes is barred because it has been decided that whatever probative value such evidence has is outweighed by the disadvantage of diverting the trier of fact from an objective appraisal of the defendant's guilt or innocence. [*People v DerMartzex*, 390 Mich 410, 413; 213 NW2d 97 (1973).]

In *People v Robinson*, 417 Mich 661, 665; 340 NW2d 631 (1983), this Court reversed a conviction where a jury was allowed to hear testimony regarding the defendant's extensive criminal record, despite the trial court's instruction that the testimony was only to be considered as the basis of an expert psychologist's opinion.

> We agree with the defendant that it "is simply incredible that anyone would hear all of those prior acts of criminal conduct and then remove them from their mind based upon an instruction by the court when they are then to consider the guilt or innocence of the accused."

Thus, it is apparent that we have already adopted rules which exclude relevant evidence and will not allow its introduction even when accompanied by cautionary instructions.

Jurisprudence under MRE 403 thus has always recognized that some evidence is simply inadmissible, regardless of whether its proffered use might be otherwise appropriate. The lead opinion correctly states that "the purpose for which evidence

is admitted . . . governs its proper use,"[13] but it ignores the equally well-established principle that the propensity of some evidence to impermissibly mislead a jury is of sufficient magnitude that the evidence must be excluded, regardless of the existence of a "proper" use for that evidence. See *DerMartzex* and *Robinson, supra.*

Our laws of evidence are rife with illustrations of how a fundamental mechanism for assuring the accuracy of a jury's truth-seeking function involves withholding from a jury certain undeniably relevant, unquestionably true pieces of evidence where that evidence might mislead a jury. Evidence of the details of a codefendant's guilty plea can be precisely this type of misleading evidence, because of the danger that it will lead a jury to the natural inference, despite any admonitions from the bench to the contrary, that if one defendant is a murderer, his codefendant must also be one.

Mr. Manning was denied a fair trial because the truth-seeking process of his trial may have been perverted in the following manner: once the jury learned that William Luna pled guilty of being a murderer, the jury would inescapably conclude that Mr. Manning was also a murderer, since the prosecution's case against Manning was almost identical to (or worse than) the case against Luna the jury had heard. Instead of weighing the government's case against Manning and coming to an independent conclusion regarding whether Manning was guilty of murder, the jury was strongly tempted to circumvent the prescribed process and conclude "if Luna is a murderer, then Manning must also be a murderer." Telling the jury that Luna is an admitted murderer effectively foreclosed the jury's ability logically to come to any

[13] *Ante,* p 14.

different conclusion regarding Manning, so long as the government's case against Manning was at least as strong as that against Luna. If a jury is told that case A equals case B and case A equals murder, there is no logical way for the jury to ever conclude that case B does not also equal murder.

The lead opinion relies on federal cases to support its holding that admission of a codefendant's plea does not constitute error, provided the bench properly cautions the jury on the plea's use, but it fails to mention a line of federal cases which hold that reversal may be appropriate if a cautionary instruction is not given, if it is insufficient, or if there are other factors "aggravating" the prejudice. See, e.g., *United States v Harrell,* 436 F2d 606 (CA 5, 1970), *Gaynor v United States,* 101 US App DC 177; 247 F2d 583 (1957), *Payton v United States,* 96 US App DC 1; 222 F2d 794 (1955), and *LeRoy v Gov't of Canal Zone,* 81 F2d 914 (CA 5, 1936). The lead opinion does mention *United States v Baete,* 414 F2d 782 (CA 5, 1969), correctly indicating that federal courts recognize that there are situations in which introduction of a codefendant's guilty plea may require reversal. This line of federal cases clearly holds that, while a cautionary instruction will generally be adequate to preserve the rights of a defendant from unlawful prejudice caused by introduction of a codefendant's guilty plea, there are situations where such introduction may require reversal because of "aggravating" circumstances. I believe such aggravating circumstances clearly exist in this case, where Luna's and Manning's defenses were so similar and complementary, where one codefendant pled guilty after four full days of trial and where the prosecutor commented upon the substantive im-

port of the codefendant's plea.[14] In fact, *Baete*
states that this is *precisely* the sort of case where
a corrective instruction would be insufficient to
cure prejudice.[15]

Ultimately, however, this federal precedent is
only tangentially useful to us. First, the question
raised in the federal authority deals with the
appropriateness of introducing evidence of a guilty
plea. The issue here is not whether Luna's plea
should have been mentioned to the jury (I am in
agreement that the jury should have been told
why Luna left the defense table), but, rather, *what*
should have been told to the jury regarding Luna's
plea. On that question, the holdings of these fed-
eral cases are not as important as the dicta
adopted in the reasoning of most of these opinions,
exemplified in *Scarborough v United States*, 232
F2d 412, 414 (CA 5, 1956):

> When appellant chose to exercise his constitu-
> tional right of pleading not guilty, after his four-
> teen co-defendants had entered pleas of guilty,
> *only the utmost care and caution on the part of
> Government counsel and of the court could assure
> him a fair and impartial trial.* [Emphasis added.]

I believe that "utmost care and caution" in this
case required the nondisclosure of the fact that
Luna pled guilty of "murder."

Second, federal precedent is of limited use to us

---

[14] The prosecutor argued in rebuttal: "Mr. Manning wants to dis-
count Mr. Luna's plea of guilty to murder and say he was taking a
sure thing. Ladies and gentlemen, ask yourself who in the world
would plead guilty to murder if they didn't do it?"

[15] We recognize the fact that there may be aggravated circum-
stances in which the strongest corrective instruction would be
insufficient, as, for example, where the guilty plea of one
codefendant necessarily implicates another or others. [*Baete* at
783-784.]

because we are asked in this case to determine rules of trial procedure in the courts of this state. Decisions regarding how the federal courts limit the introduction of evidence are useful to us only by way of analogy.

The lead opinion's reliance on federal precedent for the proposition that the court's cautionary instruction cured any prejudice caused by the admission of Luna's guilty plea is unfounded. Members of both the bench and bar recognize that instructions are not always effective in steering juries away from prohibited inferences. In fact, as Justice LEVIN pointed out in dicta in his opinion for the Court in *People v Giacalone,* 399 Mich 642, 647, n 8; 250 NW2d 492 (1977), "[a]sking a jury not to draw an adverse inference . . . may underscore the inference; even if some or all the jurors had missed the inference, the instruction will draw it for them." In *People v Woods, supra,* this Court based its ruling, in part, on an understanding that the jury ignored a judge's instructions. At issue was whether the government had failed to fulfill its duty to correct a witness' perjurious testimony that he had received no benefit in exchange for appearing as a witness. The prosecutor told the jury in opening argument that the witness was given a deal, but the witness testified he was given no consideration. The trial court properly instructed the jury that the prosecutor's arguments were not to be considered as evidence, but this Court found that the jury probably ignored the witness' lies and treated the prosecutor's argument as evidence of the existence of a deal:

Jurors are well aware that informers are often, if not usually, given consideration for their testimony, and we believe that the trial judge's instruction could not have prevented the jury from believ-

ing that [the witness] was given consideration for his testimony. [416 Mich 604.]

I would likewise conclude that the risk was too high that Manning's jury could not follow the judge's instructions to ignore the strong inference of guilt created by Luna's plea and conviction.[16]

Had the trial court granted Manning's motion and merely instructed the jury that Luna had pled guilty of an unspecified offense, the jury could have as easily inferred that Luna had pled guilty of carrying weapons or felony-firearm, and its verdict regarding Manning's murder charge would not have been foreclosed. Although that instruction would also have been imperfect (and, indeed, would have allowed the jury also to infer that Luna had pled guilty of first-degree murder), it was a risk Manning was willing to take, and I believe it was error not to allow him to do so.

**B**

However, I agree that evidence of a witness' conviction is often crucial to a jury's evaluation of that witness' credibility. This Court has consistently recognized that an accomplice's or a witness' guilty plea must be revealed to the trier of fact so that it may consider the witness' bias or motive to fabricate adverse testimony in exchange for leniency in the resolution of any criminal proceedings then pending against that witness. See, e.g., *People v Atkins,* 397 Mich 163; 243 NW2d 292 (1976); *People v Woods, supra; People v Standifer, supra.*

Therefore, when facing the question whether

---

[16] Federal cases, upon which the lead opinion largely rests, *also* support my reasoning. See, e.g., *Bruton, supra* at 135, regarding "the practical and human limitations of the jury system . . . ." See also *Cruz,* n 6 *supra.*

and how a testifying codefendant's guilty plea should be presented to a jury, we are confronted with a serious dilemma: on the one hand the admission of the evidence could seriously subvert the jury's truth-seeking function, while on the other it could enhance that function.

I agree with the rule announced insofar as it can be construed to hold that the terms and details of an accomplice/witness' guilty plea should not be revealed to the jury unless the defendant chooses to attack the witness' credibility on the basis of that plea, or unless disclosure is necessary to prevent or rebut perjury. I think it is important to indicate, however, that this nondisclosure applies equally to the judge. The error committed here was not that the prosecution was allowed to cross-examine Luna about the plea, but that the trial court itself informed the jury that Luna had pled guilty of murder. I would prefer a rule which *clearly* stated that neither the judge nor the prosecution may inform the jury of the details of an alleged accomplice's guilty plea unless and until the trial court inquires of defense counsel whether the plea will be the subject of cross-examination. The lead opinion comes close to stating such a rule, but I prefer more clarity.

There is no question that both the prosecution and the trial court must disclose the existence of a guilty plea agreement in an instance where a witness denies its existence. See *People v Standifer, supra, People v Woods, supra, People v Rosengren,* 159 Mich App 492; 407 NW2d 391 (1987), lv den 429 Mich 870 (1987), *Napue v Illinois,* 360 US 264; 79 S Ct 1173; 3 L Ed 2d 1217 (1959), and *Giglio v United States,* 405 US 150; 92 S Ct 763; 31 L Ed 2d 104 (1972).[17] However, while the prosecu-

---

[17] Further, as acknowledged by Justice LEVIN in his concurring

tion bears the responsibility of preventing a witness' false testimony from going uncorrected, this principle does not answer the question whether, aside from the instances of a witness' perjury, the details of a codefendant's plea should be disclosed, irrespective of whether disclosure would create the risk that a jury will find a defendant guilty by reason of his association with the admittedly guilty.

When a codefendant pleads guilty and testifies for the prosecution, I would hold that (1) the prosecution must disclose to the court and to the defense any consideration a witness/accomplice received in exchange for testimony and (2) it remains the defendant's choice under MRE 607[18] whether to impeach the witness through the introduction into evidence of the details of the witness' guilty plea. The prosecution should not be allowed to inform the jury of the details of a witness/ accomplice's guilty plea over the objection of the defendant so long as the defendant refrains from making that plea a subject of cross-examination. Upon the defendant's request, the court should merely instruct the jury that the codefendant pled guilty. When some form of leniency is promised or given the witness, the court should inform the jury

---

opinion in *People v Atkins, supra* at 179-180, this duty is also incumbent under the rules of professional responsibility.

[18] Rule 607 provides:

The credibility of a witness may be attacked by
(1) an opposing party; or
(2) the calling party if
(A) the calling party is the prosecutor and he is obliged to call the witness,
(B) in a civil case, the witness is an opposite party or employee or agent of an opposite party, or
(C) the witness's testimony was contrary to that which the calling party had anticipated and was actually injurious to the calling party's case.

of the nature of any consideration given the witness in exchange for his testimony but should refrain from revealing the crime of which the witness has pled. Where a defendant seeks to attack the credibility of a witness on the basis of that witness' bargain with the prosecution, however, the details of the plea may be disclosed.

By giving effect to the Rules of Evidence and examining the non-"existential"[19] realities of a criminal trial, it becomes apparent why the defendant should have the choice whether to elicit for the jury the terms of a witness' guilty plea. The clear language of MRE 607 reserves to the defendant the choice whether to impeach a prosecution witness. Furthermore, because the introduction of the terms of the guilty plea should hinge on whether the defendant attacks the witness' credibility because of the plea, it logically follows that the defendant, better than the judge, will know whether he will pursue such impeachment. Because only the defendant is in a position to know whether evidence of a codefendant's guilty plea will subject him unfairly to an inference of guilt by association, it should be the defendant's prerogative whether to put that evidence before the jury.

I believe that, in the majority of cases, most defendants will opt for the disclosure of a witness' guilty plea as a means to attack that witness' credibility. However, as exemplified by the facts of this case, where the testifying witness was also a former codefendant who entered a guilty plea on the fifth day of the trial, the defendant may well have opted to impeach Luna's credibility in a fashion other than the introduction of the guilty plea in order to minimize the risk of guilt by association.[20]

---

[19] See *ante,* p 19.

[20] For a discussion of this problem on the federal level, see note, *A*

I fear the lead opinion's holding does not articulate clearly enough the trial court's duty to inquire of defense counsel whether a testifying accomplice's guilty plea will be made the subject of cross-examination. The lead opinion cites federal precedent, but not the record, to support its notion that it was somehow clear to the trial judge that Manning's counsel intended to cross-examine Luna on the basis of Luna's plea after defense counsel requested that terms of the plea be kept from the jury. Such a finding must have been based on conjecture, rather than inquiry. The fact that the lead opinion upholds that ruling today implies that it is not necessary for a trial court to *know* that defense counsel will cross-examine a witness on the basis of the plea, but, rather, that a judge's guess is sufficient basis for the introduction of extremely prejudicial evidence. The court should base its ruling upon an inquiry into the defense counsel's strategy, and not upon conjecture. If defense counsel later seeks to impeach the witness on the grounds of the plea, then it is within the court's discretion to inform the jury of the details of the plea or to allow the government to elicit the details on redirect examination.

My proposed rule presupposes that MRE 607(2) (A) is a valid rule of evidence which should be given force and effect. That the lead opinion dislikes this "voucher" rule is clear, but the issue of that rule's validity is not before the Court today. Furthermore, the lead opinion's reasons for abolishing MRE 607 in this case give no compelling reasons why the rule should be ignored in this case rather than abolished completely. In effect, the lead opinion would nullify MRE 607 and would do so disingenuously by making this very impor-

*prosecutor's duty to disclose promises of favorable treatment made to witnesses for the prosecution,* 94 Harv L R 887 (1981).

tant precedent in a case which does not raise the validity of that rule as an issue.

The validity of MRE 607(2)(A) is an academic issue in this case which, therefore, should be addressed by this Court only for very compelling reasons. I find no compelling reason to construe MRE 607, let alone modify it, particularly in light of the fact that the issue of that rule's effect on this case was not argued in the trial court or in the Court of Appeals. The parties have never addressed this Court on that subject, either in briefs or at oral argument. If this Court wants to address the validity of MRE 607(2)(A), it should do so in a case where that issue is actually raised, briefed, and argued. See *Kirby v Larson,* 400 Mich 585, 658; 256 NW2d 400 (1977) (FITZGERALD, J., concurring in part).[21]

The purpose behind the disclosure of a witness' acceptance of a guilty plea is to allow the jury to consider a witness' believability and potential motive to fabricate because of a benefit promised or given in exchange for coöperation with the prosecution. Because it is the benefit received which triggers scrutiny of a witness' motives, in cases where alleged accomplices testify for the prosecution and where the defendant objects to the introduction of the details of the witness' plea, the court should inform the jury of the nature and extent of any consideration received without disclosing the specific offense of which the witness/ accomplice has pleaded. Because I agree that information regarding consideration given in exchange for testimony is important for the jury's assessment of a witness' credibility, I would adopt this

[21] The lead opinion thinks this case raises the question of which party has the "right to draw first blood." *Ante,* p 17. That question is clearly not before this Court. Defendant's motion in the trial court did not request permission to impeach Luna first, but, rather, asked that the terms of Luna's plea be kept from the jury.

rule which strikes a balance between warning the jury of possible bias and preventing convictions on the basis of the admitted crimes of another.

### CONCLUSION

I would hold that the trial court erred in its refusal to grant a mistrial. I would further hold that where the defendant is fully aware of the details of a testifying former codefendant's guilty plea, whether and how the details of that plea are disclosed to the jury remain the prerogative of that defendant.[22] I believe the prosecution and the trial court should only be required to disclose a witness' guilty plea where its nondisclosure would allow a witness' testimony to remain false, where defense counsel does not have specific knowledge of that agreement, or where a defendant attacks the witness' bias because of the plea.

It is not required that the exact nature of the plea be disclosed to the trier of fact. Rather, upon disclosure, it should only be required that the jury be informed of the existence of a plea, and the nature of any consideration received by the witness in exchange for his plea and testimony without disclosing the precise crimes of which the witness/accomplice pleaded.[23]

Therefore, I find that upon the facts of this case, both the midtrial plea of the codefendant and the disclosure of the details of that plea unfairly prejudiced the defendant. Accordingly, I would reverse defendant's conviction and remand to the trial court for a new trial.

---

[22] Accord *People v Evans,* 30 Mich App 361; 186 NW2d 365 (1971); *People v Love,* 43 Mich App 608; 204 NW2d 714 (1972); *People v Atkins; People v Tillman,* 85 Mich App 425, 434; 271 NW2d 261 (1978); *People v Woods; People v Standifer, supra.*

[23] Accord *People v Lytal, supra.*

LEVIN and CAVANAGH, JJ., concurred with
ARCHER, J.

LEVIN, J. (*dissenting*). I agree with the signers of
the lead opinion that where it appears that the
defendant will rely on terms of a plea agreement
to impeach the credibility of an accomplice, the
prosecutor should ordinarily be permitted to bring
out the terms of the plea agreement during the
direct examination of the accomplice.

### I

The recitation of the terms of the plea agree-
ment in the instant case was, however, incomplete.
The judge advised the jury that Luna had "entered
a plea to murder in the second degree and the
Court accepted that plea." That did not fully re-
flect all the terms of the plea agreement. The plea
agreement included that "the prosecutor would
recommend that the Court stay within the guide-
lines in sentencing" Manning.

Neither the prosecutor nor Manning's lawyer[1]
adverted, on direct or cross-examination of Luna
or during closing arguments, to this aspect of the
plea agreement, or to the difference between the
mandatory life sentence without possibility of pa-
role, required by law to be imposed had Luna been
convicted of first-degree murder, and the sentence,
*any* term of years or life with possibility of parole
after ten years, that could be imposed in conse-
quence of Luna's plea of guilty of second-degree
murder.

The guideline sentence for Luna, who like Man-
ning had no prior criminal record, was 120 months
(ten years) to life. Luna was actually sentenced to
ten to twenty years.

---

[1] It does not appear whether Manning's lawyer was informed of the
sentence recommendation term of the plea agreement.

One of the consequences of the trial court's decision, after Luna pled guilty, not to grant a severance (mistrial) and a new trial to Manning was that Luna was not sentenced until after Manning was convicted. The jury thus was not informed and was left to "speculate" regarding the extent of the consideration Luna actually received.

The lead opinion states that withholding from the jury the identity of the lesser offense, second-degree murder, of which Luna had pled guilty "could have confused and misled the jury" which then may have "incorrectly speculated that Luna had somehow wriggled out of accepting criminal responsibility for the events to which he testified and had pleaded guilty of some other lesser or entirely different offense,"[2] and "that inviting such speculatation is both the purpose and the function of the request to suppress"[3] that Luna had pled guilty of second-degree murder. The jury was, however, left to speculate regarding the sentence to be imposed on Luna.

To be sure, immediately before accepting Luna's plea, the judge informed him that there had been no agreement with regard to the "possible sentence." Nevertheless, the judge sentenced at precisely the guideline ten-year minimum sentence.

The jury should have been informed, to avoid "confusing," "misleading" and "speculation," that a person sentenced to a ten-year minimum sentence will ordinarily be paroled upon serving the ten years less good-time credits, and accordingly would ordinarily be paroled after approximately eight years.

II

The lead opinion states that "[i]n exchange for

---

[2] *Ante,* p 10.

[3] *Ante,* p 10.

his plea of second-degree murder, *and his testimony,* the prosecutor dismissed the remaining charges."[4] (Emphasis supplied.) If, as the signers of the lead opinion apparently, with some justification, conclude, a part of the plea agreement was that Luna would testify, that was another aspect of the plea agreement not disclosed to the jury. Nor was the significance of that aspect of the plea agreement disclosed.

If an unstated or implicit condition of the plea agreement was that the prosecutor would recommend sentencing within the guidelines only if Luna gave "truthful" testimony and that, if he did not, the prosecutor would not so recommend, the significance of that condition should have been stated to the jury lest it be confused or misled. If, although there was no explicit "agreement" on the possible sentence, the general practice of the court is to sentence in accordance with the prosecutor's recommendation if the prosecutor concluded that the testifying accomplice had, in accordance with the unstated but implicit condition, given "truthful" testimony, that practice should have been disclosed to the jury in order to avoid confusing and misleading it. If Luna could only obtain the benefit of the plea bargain and the ten-year minimum sentence, parolable after approximately eight years, by iterating statements that coincided with the prosecutor's version of the truth, the jury should have been so informed.

### III

Also not disclosed to the jury was that a plea bargain[5] was offered to Manning. Ordinarily negotiations for settlement—and sentencing ranges

---

[4] *Ante,* p 4, n 2.

[5] The nature of the bargain offered to Manning does not appear.

also—are not admissible in evidence. Where accomplice testimony is offered against another participant after a plea bargain, there is an innuendo that the prosecutor—who may reduce the charged offense only to serve the ends of justice—believes that the testifying accomplice is telling the truth in implicating the defendant still on trial as the more grievous offender.

The courts admit evidence, otherwise inadmissible, on the ground that the "door has been opened." The bargain offered Manning, ordinarily inadmissible, should have been admitted to counter the innuendo that the prosecutor had concluded that Manning was more guilty than Luna and therefore had not offered Manning a plea bargain, and so that Manning could counter Luna's statement, that he pled guilty because he was, "we're,"[6] guilty, with the statement that he, Manning, had rejected the plea bargain because he was not guilty of murder.[7]

IV

Luna gave conflicting statements.

The evidence of an accomplice, especially in the context of a plea agreement, may be unreliable. In *People v McCoy,* 392 Mich 231, 236-237; 220 NW2d 456 (1974), this Court recognized that a defendant has the right to have the judge caution the jury concerning the use of accomplice testimony. In an early case this Court said:

> We think it is the duty of a judge to comment upon the nature of such testimony [of an accomplice], as the circumstances of the case may re-

---

[6] *Ante,* p 6, n 4.

[7] And, possibly, that Luna had accepted the plea bargain because he was guilty.

quire; to point out the various grounds of suspicion which may attach to it; to call their attention to the various temptations under which such witness may be placed, and the motives by which he may be actuated; and any other circumstances which go to discredit or confirm the witness, all of which must vary with the nature and circumstances of each particular case. [*People v Jenness,* 5 Mich 305, 330 (1858).]

A criminal jury instruction provides that accomplice testimony should be examined "closely" and accepted "only with caution and care," that the jury may consider "any reward or inducement offered which may have caused him to testify falsely," that the court should state what the evidence has shown and enumerate or define the reward,[8] and that the jury may "consider whether the testimony was affected by the witness's being granted immunity from punishment, receiving a promise of leniency, or being allowed to plead guilty to a lesser offense."[9] Such an instruction was not given in the instant case. Nor, I acknowledge, does it appear that such an instruction was requested.

v

The lead opinion states that it is necessary to modify the voucher rule to permit reference to a plea agreement in the circumstances of this case. The voucher rule, as set forth in MRE 607(2)(A), bars the calling party from "attack[ing]" the credibility of a witness. The lead opinion states that the jury was properly permitted to draw a "rehabilitating inference of Luna's credibility from the fact that he had formally accepted criminal responsibil-

---

[8] See parts II and III, *supra.*

[9] CJI 5:2:03.

ity for his actions."[10] If the plea agreement was
admitted for that purpose, it was not admitted as
an "attack" on Luna's credibility, and the voucher
rule was not violated. There is no need to modify
MRE 607(2)(A) in order to permit a prosecutor to
elicit on direct examination the terms of the plea
agreement.

## VI

The lead opinion concludes that the jury should
have been permitted to draw the rehabilitating
inference that Luna had accepted criminal respon-
sibility for second-degree murder, and that the
prosecutor properly argued that Luna would not
have accepted responsibility for second-degree
murder unless he had in fact committed second-
degree murder, although, by accepting the plea
agreement offered by the prosecutor and perform-
ing in accordance with the prosecutor's under-
standing of the agreement, Luna was in effect
sentenced, in exchange therefor, to serve approxi-
mately eight years rather than risking life in
prison without possibility of parole.

This Court does not know whether Luna or
Manning or either of them told the truth, and
cannot determine to what extent Luna's testimony
was shaped by the consideration that was offered
and delivered.[11]

When faced with the alternatives of life in
prison without possibility of parole and a far lesser

[10] *Ante,* p 10.

[11] In *People v Wolcott,* 51 Mich 612, 615; 17 NW 78 (1883), this
Court held inadmissible a confession obtained "by impressing upon
the mind of the respondent that it would be better for him, or he
would get off easier if he made confession. . . . No reliance can be
placed upon admissions of guilt so obtained; for the very obvious
reason that they are not made because they are true, but because,
whether true or false, the accused is led to believe it is for his interest
to make them."

sentence, even a person who does not truly believe himself guilty of the charged offense or the lesser plea bargain offense might—possibly on the advice of counsel—agree to whatever the prosecutor demands, lest he spend the rest of his life in prison. Since neither this Court nor the jury can determine—and in all events it is not an, or the, issue— whether Luna truly accepted criminal responsibility for second-degree murder or rather simply accepted punishment of approximately eight years, Luna's plea of guilty of second-degree murder, rather than of some other lesser offense which would have carried a like minimum term, is of little probative value in rehabilitating Luna's credibility or otherwise.

I agree therefore with the other dissenting justices that there was no need to inform the jury of the lesser offense, second-degree murder, of which Luna pled guilty. The crux of the plea agreement is not the offense of which Luna pled guilty, but that he had pled guilty of an offense and in return for that plea and his testimony (or "truthful" testimony) he would probably be sentenced to serve approximately eight years, rather than risking life in prison without possibility of parole.

VII

The lead opinion states that the decision whether to grant or deny a motion for mistrial rests in the trial court's sound discretion, and then dismisses the dissenting opinion without further ado or discussion of what the trial court should consider in informing the exercise of that discretion.

The American Bar Association standard on severance of defendants provides that the court should grant a severance *during trial,* with the

consent of the defendant to be severed, where "severance is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants,"[12] and that in deciding whether severance is required, the court should consider the risk of guilt by association and inconsistent defenses escalating into cross accusations between defendants.[13]

No reason for not granting a severance (mistrial) appears except the time investment in four days of trial. Surely severance could not properly be denied to delay sentencing Luna until he gave what the prosecutor believed to be "truthful" testimony, or to withhold from the jury the exact sentence concession that he actually received, or to send a message to wise guys who do not accept plea bargains that are a "gift."

The justice system operates, on the whole, fairly. The appellate courts must, however, vigilantly supervise the expedients, including plea bargaining, developed to move the docket, in the administration of justice, to guard against possible and potential manipulation. In the instant case the prosecutor, armed by the state with far greater resources than the defense, outmaneuvered the defense. The jury was not *fully* informed of what had actually occurred and of the significance of what had actually occurred. Manning did not receive a fair trial.

The justice system is overburdened, but the four days invested in the joint trial is but a fraction of the over twenty thousand days (55 years) that Manning is likely to be imprisoned without possibility of parole.

[12] ABA Standards for Criminal Justice (2d ed), Standard 13-3.2(b)(ii), p 13-34.

[13] Commentary on Standard 13-2.2, pp 13-17 to 13-21, Standard 13-3.1, pp 13-30 to 13-34, and Standard 13-3.2, pp 13-35 to 13-38.

A fair determination of Manning's guilt or innocence on the question whether he is guilty of first-degree or second-degree murder or some lesser or other offense requires that he be retried after Luna has been sentenced so that the true consideration for his testimony may be revealed, and confusion, misleading, and speculation avoided. This One Court of Justice can spare him four more days even if the evidence at the retrial proves to be, and I doubt it would be, entirely repetitious of the evidence at the joint trial.